# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

| | |
|---|---|
| ROBERT LANCE JOHANSEN as ) | |
| administrator of the estate of ) | |
| LAUREN JOHANSEN, ) | |
| ) | |
|    Plaintiff ) | |
| ) | 3:25-cv-00690 |
| v. ) | |
| ) | Judge Aleta Trauger |
| BROOKE'S BAIL BONDING, LLC et al. ) | JURY TRIAL DEMANDED |
| ) | |
|    Defendants. ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS BROOKE HARLAN-EVITTS AND BROOKE'S BAIL BONDING, LLC'S MOTION TO DISMISS

---

Defendants Brooke's Bail Bonding, LLC, and Brooke Harlan-Evitts (jointly, "Defendants"), who bear the burden of explaining to the Court why the dismissal under Rule 12(b)(6) is appropriate, have failed to do so.

First, Defendants quote the Amended Complaint's allegations that describe how Ms. Harlan-Evitts failed to take any action to impede Bricen Rivers and affirmatively authorized his release even though she knew that Bricen Rivers had violated his bond conditions, knew that he was a danger to Lauren Johansen, and had ample opportunity to fulfill her obligation to the Court to return him to state custody. Defendants' only discussion of these allegations is the bald statement that her acts and omissions "are not sufficient to satisfy the five requisite elements of a wrongful death claim," followed by a misplaced argument about group pleading.

Second, in arguing for dismissal of Plaintiff's §1983 claim, Defendants point to authority that is only superficially relevant and relegate to a footnote the Sixth Circuit's operative test for determining whether a private entity's conduct may be fairly attributed to the state.

Finally, Defendants' arguments for dismissal of the counts for partnership and joint venture, admittedly more fleshed out, are simply incorrect. Tennessee law is clear that partners and joint venturers are jointly and severally liable for wrongs committed in the course of partnership and joint venture business. And the Amended Complaint sufficiently alleges that Brooke's Bail Bonding partnered with, or formed joint ventures with, many of its codefendants.

Defendants' arguments do not withstand scrutiny, but more fundamentally, they lack sufficient substance to meet their Rule 12(b)(6) burden. Plaintiff, mindful that his claims hang in the balance, has thoroughly responded to Defendants' perfunctory arguments for dismissal. But the Court should summarily reject the majority of Defendants' bald argumentation.

1

## BACKGROUND

Defendant Brooke's Bail Bonding, LLC ("Brooke's Bail") operates as a for-profit bail bonding company in Davidson County. (Am. Compl. ¶ 37.) Defendant Brooke Harlan-Evitts is the owner of Brooke's Bail and exercises managerial authority over its activities. (*Id.* ¶¶ 4, 89.)

Bail bonding companies are an integral part of Davidson County's criminal justice system and operate as *de facto* pretrial services for many criminal defendants out on bond. (*Id.* ¶¶ 29-34.) Bail bonding companies are heavily regulated by Tennessee statute and criminal court rules. (*Id.* ¶¶ 26-27.) One such regulation requires that bail bonding companies maintain sufficient liquidity to pay a forfeited bond. (*Id.*) Rather than maintain large amounts of cash liquidity, many bail bonding companies partner with insurance companies who execute powers of attorney that allow agents of bail bonding companies to post bonds against lines of credit. (*Id.* ¶¶ 38-41.) Brooke's Bail partners with one such insurance company, Continental Heritage Insurance Company ("CHIC"). (*Id.* ¶¶ 41-47.) Brooke's Bail manages the day-to-day affairs of the bail bonding partnership, whereas CHIC provides financial backing that allows the partnership to post bonds for more clients than Brooke's Bail otherwise could on its own. (*Id.*) Brooke's Bail and CHIC share profits and losses; whenever a criminal defendant pays a premium, Brooke's Bail and CHIC each receive a portion of that premium, and whenever the criminal court requires forfeiture of a bond, Brooke's Bail and CHIC share the cost of paying the bond to the Court. (*Id.*)

In December 2023, nonparty Bricen Rivers ("Rivers") was arrested in Davidson County for battering Decedent Lauren Johansen and was charged with three felonies, including aggravated stalking. (*Id.* ¶¶ 53-55.) Rivers's criminal case was assigned to Judge Blackburn in Division III of the Davidson County Criminal Court. (*Id.* ¶ 56.) The criminal court initially set Rivers's bail at $250,000 but ultimately lowered it $150,000. (*Id.* ¶¶ 56-57.) The criminal court also placed

2

several conditions on Rivers's bond, including that he stay under GPS monitoring, remain in Davidson County, and keep away from Lauren Johansen. (*Id.* ¶¶ 68.) Brooke's Bail formed an agreement with another bail bond company, Defendant On Time Bail Bonding ("On Time"), to each take responsibility for $75,000 of the bond. (*Id.* ¶¶ 65-66.) The Court memorialized the conditions of bond in an order and an agent from Brooke's Bail signed that order. (*Id.* ¶ 72.)

One of Brooke's Bail's agents, Nakeda Wilhoite, is also the owner of a GPS monitoring company, Defendant Freedom Monitoring, LLC. (*Id.* ¶ 5.) Once Rivers arrived at Brooke's Bail's office, Ms. Wilhoite directed another of Brooke's Bail's agents, Alisha Ridley, to affix a GPS ankle monitor to Rivers's ankle. (*Id.* ¶ 80-81.) Then, despite clear instruction that Rivers was to stay in Davidson County, agents from Brooke's Bail immediately facilitated his travel to Mississippi by bus. (*Id.* ¶ 82.)

Several days later, Ms. Harlan-Evitts and Brooke's Bail's other agents began having issues with Rivers's ankle monitor and asked him to return to Brooke's Bail's office. (*Id.* ¶ 86.) Rivers returned to Brooke's Bail's office in Davidson County and met with Wilhoite, who replaced Rivers's ankle monitor. (*Id.* ¶ 90.) Ms. Harlan-Evitts was aware that Rivers and Ms. Wilhoite were meeting at Brooke's Bail's office. (*Id.* ¶¶ 89, 91.) Ms. Harlan-Evitts was also aware of the numerous conditions on Rivers's bond. (*Id.* ¶ 89.) Nonetheless, Ms. Harlan-Evitts did not direct Ms. Wilhoite or any other agent of Brooke's Bail to arrest Rivers and return him to state custody, nor did she contact the court or law enforcement to effectuate his arrest. (*Id.*)

Despite knowledge that Rivers had violated the conditions of his bond, Ms. Harlan-Evitts authorized the release of Rivers and Ms. Wilhoite actually released Rivers from Brooke's Bail's office. (*Id.* ¶ 99). Rivers traveled to Mississippi, and Ms. Harlan-Evitts, despite knowledge that Rivers was once again in violation of his bond, took no legitimate efforts to compel him to comply

with the conditions of his release for multiple days. (*Id.* at ¶¶ 101-106.) Rivers then kidnapped Lauren Johansen and beat her to death. (*Id.* ¶ 107.)

## LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, the Court's task is only to determine "whether 'the claimant is entitled to offer evidence to support the claims,' not whether the plaintiff can ultimately prove the facts alleged." *United States v. Se. Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 574 (M.D. Tenn. 2021) (quoting *Swierkiewicz v. Sorema N.A.*, 543 U.S. 506, 511 (2002)). In other words, a complaint need only "raise a right to relief above the speculative level," by alleging "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (first quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Three steps control this determination. First, "the court must accept all of the Plaintiff's factual allegations as true." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) (citing *Logsdon v. Harris*, 492 F.3d 334, 340 (6th Cir. 2007)). Second, "the court must draw all reasonable inferences in the plaintiff's favor." *Id.* (citing *Logsdon v. Harris*, 492 F.3d at 340). Third, "the court must take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." *Id.* (citing *Iqbal*, 556 U.S. at 679). And then, "if it is at all possible (beyond a wing and a prayer) that a plaintiff would succeed if he proved everything in his Complaint, the case proceeds." *Id.*

## DISCUSSION

### I. The Amended Complaint states a wrongful death claim against Ms. Harlan-Evitts

The Amended Complaint details how Ms. Harlan-Evitts, the owner and manager of Brooke's Bail, had multiple opportunities to effectuate the arrest of, or otherwise stop, Rivers, both

4

before and after his trips to Mississippi in violation of his bond conditions. Because she made no legitimate effort to do so, Lauren Johansen was kidnapped, beaten, and killed.

### a.  The Amended Complaint Sufficiently alleges Ms. Harlan-Evitts's Negligence

The elements of negligence in Tennessee are: (1) "a duty of care owed by defendant to plaintiff;" (2) "conduct below the applicable standard of care that amounts to a breach of that duty;" (3) "an injury or loss;" (4) "cause in fact;" and (5) "proximate, or legal, cause." *Lanahan v. Regions Bank*, 732 F. Supp. 3d 816, 825 (M.D. Tenn. 2024) (quoting *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019)). The Amended Complaint alleges facts establishing each of these elements as to Ms. Harlan-Evitts.

### 1.  Duty

Tennessee recognizes a species of negligence based on failure to protect a plaintiff from a third party when the defendant "stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger." *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997). In determining whether a duty is owed in a particular case, Tennessee courts use a balancing approach consistent with principles of fairness. *Id*. Using this analysis, the Tennessee Supreme Court has found that a psychiatrist had a duty to take action to protect individuals placed at risk of bodily harm by a violent patient, that a physician had an affirmative duty to warn members of a patient's family about a contagious disease, and that a physician owed a duty to a third party who was injured by a truck driver the physician negligently examined and certified. *See Turner*, 957 S.W.2d 820-21 (psychiatrist); *Bradshaw v. Daniel*, 854 S.W.2d 865, 872-73 (Tenn. 1993) (communicable disease); *Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521, 526-28 (Tenn. 1980) (truck driver certification).

Here, the special relationship described in *Turner* was created by Defendants' decision to post bond to obtain Rivers' release from jail. When determining the amount of a bail bond and whether to impose conditions of release, the courts expressly consider the safety of the community and of the alleged victim. *See, e.g.*, Tenn. Code Ann. § 40-11-116(a) (when imposing conditions of release, the court "must impose the least onerous conditions reasonably likely to ensure the safety of the community…"); § 40-11-118 (bail must be as low "as the court determines is necessary to reasonably ensure the safety of the community…"); § 40-11-150 (before releasing a person charged with aggravated stalking, the court "shall impose one (1) or more conditions of release or bail on the defendant to protect the alleged victim…"). Pursuant to Rule 9 of the Local Rules of Practice for Bail Bonds, as set forth by the Criminal Court for Davidson County, Brooke's Bail "acts as an agent of the Court and the conduct of the bonding company constitutes an integral part of the operation of the Court." A copy of these Rules are attached hereto as **Exhibit A**; (*see also* Am. Compl. ¶ 29.)

The conditions set by the Davidson County Criminal Court to ensure the safety of the community and of the alleged victim, Ms. Johansen, included, *inter alia*, bail in the amount of $150,000.00, wearing a GPS bracelet, and staying in Davidson County. (Am. Compl. ¶¶ 58-59, 68.) Whether or not they bothered to read these conditions, the Defendants agreed to enforce them when one of Brooke's Bail's agents signed the Amended Order dated June 5, 2024, and another took action to bond Rivers out on June 24, 2024. (*Id.* ¶¶ 72, 75.) By these actions, which were authorized by Ms. Harlan-Evitts, Brooke's Bail voluntarily assumed a duty to Ms. Johansen to perform their duties in a manner that protected Ms. Johansen from harm by Rivers. At the very least, they assumed the duty described in the June 5, 2024 order:

> The bonding company is to surrender the defendant to the custody of the Davidson County
> Sheriff's Office ***upon notification*** by the monitoring company ***of any violations*** of the

6

Court Order. ***By signing this Order, the bonding company acknowledges the conditions of bond and its responsibility to surrender the defendant as soon as possible after notification by the monitoring company.***

(*Id.* ¶ 71 (emphasis supplied).)

Ms. Harlan-Evitts, as the owner of Brooke's Bail, exercised managerial authority over Brooke's Bail's operations at all relevant times. (*Id.* ¶ 89.) By June 28, 2024, at the latest, Ms. Harlan-Evitts had actual knowledge of the conditions of Rivers's bond and that he had been violation of those conditions. (*Id.* ¶¶ 87-88.) Upon learning that Rivers was out of compliance with his bond conditions, Ms. Harlan Evitts, at a minimum, had a duty to order Brooke's Bail's agents to arrest or take other action to return Rivers to custody after learning he had violated the conditions of his bond. (*Id.* ¶¶ 87-89.) Ms. Harlan-Evitts and Brooke's Bail owed this duty to Lauren Johansen because she was a "readily identifiable foreseeable victim" of violence at Rivers's hands, and was, indeed, specifically identified in the criminal court's order establishing the conditions of Rivers's bond. *Turner*, 957 S.W.2d at 820. Ms. Johansen would still be alive if the Defendants had only carried out this duty.

### 2. Breach

Despite owing a duty to Lauren Johansen to take reasonable measures to enforce the conditions of Rivers's bond, Defendants took none. Defendant McMillian, an authorized agent of Brooke's Bail, signed the June 4, 2024 order, in which she expressly acknowledged the conditions of bond and Brooke's Bail's responsibility to surrender Rivers "as soon as possible after notification by the monitoring company" of any violations of the Court order. (Am. Compl. ¶ 71.) Even assuming that Ms. Harlan-Evitts did not learn that Rivers had violated the conditions of his bond until June 28, 2024, Ms. Harlan-Evitts had the opportunity to return him to state custody when Rivers arrived in Brooke's Bail's office on June 29, 2024. (*Id.* ¶¶ 87-88.) Nonetheless, Ms. Harlan-Evitts did not instruct Brooke's Bail's agents to arrest Rivers and return him to state

7

custody, did not contact law enforcement in Tennessee or Mississippi, and affirmatively authorized the release of Rivers after he returned to Brooke's Bail's office to meet with Ms. Wilhoite. (*Id.* ¶¶ 89-100.)

### 3. Injury

The Amended Complaint states that Lauren Johansen was kidnapped, beaten, and killed, which are indisputably legally cognizable injuries. (*Id.* ¶ 107.)

### 4. But-for and Proximate Causation

But-for causation, or "actual causation," refers to the "cause and effect relationship between the tortious conduct and the injury." *Bernard v. Amazon.com Servs., LLC*, No. 3:23-CV-01341, 2025 WL 2306950 (M.D. Tenn. Aug. 11, 2025) (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). If Ms. Harlan-Evitts had taken reasonable measures to enforce Rivers's bond conditions, Rivers could not have traveled to Mississippi and harmed Lauren Johansen.

Proximate causation focuses on "whether the policy of the law will extend responsibility for the negligent conduct to the consequences that have occurred." *Id.* at *7. Tennessee courts use a three-prong test to consider proximate cause: (1) "the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of;" (2) "there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm;" and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *Id.* (quoting *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005)). Proximate cause is "ordinarily a jury question" and only in "rare circumstances" does not need to be evaluated by the trier of fact. *Id.* at *7 (cleaned up) (citing *Haynes v. v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994)).

All three factors urge towards a finding of proximate causation in this case. First, Ms. Harlan-Evitts's failure to take any action to enforce the conditions of Rivers's bond was a substantial factor in Lauren Johansen's injury because it allowed him to be free to travel to Mississippi. (Am. Compl. ¶¶ 87-100.) Even more so because it was Brooke's Bail's agreement to ensure Rivers complied with his bond conditions that allowed him to be released from jail in the first place. (*Id.* ¶¶ 69-71.) Second, Defendants have not identified any rule or policy that would relieve Ms. Harlan-Evitts from liability, and Plaintiff is aware of none. Indeed, to the extent that Tennessee continues to allow private for-profit bail bond companies to take a central role in the traditional state function of pretrial supervision, public policy should demand that these companies, and their management, be held accountable when they fail to make any effort to protect the victims of violent crime from violent criminal defendants. Finally, it was foreseeable that Rivers would travel to Mississippi and kill Lauren Johansen if unrestrained. In fact, this result was so foreseeable that the Tennessee legislature, duly elected by millions of persons "of ordinary intelligence and prudence," authorized criminal courts to place conditions on the bail of individuals like Rivers, and Judge Blackburn exercised this authority to place numerous conditions on Rivers's bail to keep Lauren Johansen safe. (*Id.* ¶¶ 31-32, 59.) *See, e.g.*, Tenn. Code Ann. §§ 40-11-116, 40-11-118, 40-11-150.

Because the Amended Complaint states facts constituting each element of a negligence claim against Ms. Harlan-Evitts, the Court should deny Defendants' motion as to this ground.

**b. The "group pleading" doctrine is inapplicable**

As discussed in the preceding section, the Amended Complaint makes specific factual allegations that support each element of negligence as to Ms. Harlan-Evitts. Thus, Defendants'

"group pleading" argument can be summarily rejected.[1]  Even if considered, however, the argument does not withstand scrutiny because the "group pleading" doctrine is largely inapplicable to state-law negligence claims.

As one sister court explained, "the impermissibility of 'group pleading' is often spoken of in the fraud context because plaintiffs alleging fraud must meet the requirements set out in [Fed. R. Civ. P.] 9(b) . . . ." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 973 (S.D. Ohio 2019).  In general, so long as a complaint does not present a situation where a defendant is "not even mentioned in the body of the complaint and the only allegations that could plausibly apply to them are allegations directed at all defendants," a complaint containing allegations against "Defendants generally" still satisfies Fed. R. Civ. P. 8.  *Id.* at 972-73 (cleaned up).

The cases Defendants point to in their "group pleading" argument, to the extent they have any relevance at all, support this understanding of group pleading.  *See Sheeran v. Blyth*

---

[1]  With respect to the Davidson County Criminal Court order that Defendants attached to their motion and discuss in footnote 4, Plaintiff acknowledges the Court's ability to take judicial notice of the existence of the Davidson County Criminal Court's October 7, 2024, Order, even on a Rule 12(b)(6) motion.  But the criminal court's determination not to impose sanctions pursuant to Tenn. Code Ann. §§ 40-11-125 and 40-11-126 has no preclusive effect against Plaintiff in this civil action. Indeed, if this Court were to rely on the Davidson County Criminal Court order for any purpose in evaluating the pending Motion to Dismiss, Plaintiff submits that the order further supports the allegations in the Amended Complaint. In particular, the order confirms that the "enlightening and troubling" proof showed that "the bonding companies did not act appropriately by not following [the June 5, 2024] court order," that the individuals involved showed "poor individual judgment," that Brooke's Bail's agent Defendant McMillian "knew or should have known that [Rivers] was required to have GPS monitoring, but she failed to determine the ordered exclusion zones, tracking company, and other important details," that bonding companies "should be charged with a general understanding and knowledge of the Court's orders that relate to bond or bond conditions," that Rivers's "willful violation of his bond conditions was good cause for surrender" but that "no attempts were made to surrender [Rivers] or notify the Court when he was at the Brooke's Bail office on [June 29, 2024]," and that Defendant Wilhoite's actions showed a classic conflict of interests where instead of taking action to surrender Rivers, she "chose to act as a monitoring agent and in furtherance of her business and monetary interest." *See* Exhibit A to Defendants' motion (ECF 56-1) at 1, 2, 7, 10, 11, 12, 14, 15.

*Shipholding S.A.*, No. 14-cv-5482, 2015 WL 9048979, at *3-4 (D.N.J. Dec. 16, 2015) (dismissing complaint where Plaintiff failed to even "describe[] the nature of each entity defendant [or] precisely what they were responsible for on the ship" despite alleging twenty-four different, widely-varying theories of negligence); *Rysewyk v. Sears Holding Corp.*, No. 15-cv-4519, 2015 WL 9259886, at *7 (N.D. Ill. Dec. 18, 2015) (dismissing one defendant about whom the complaint contained only one specific allegation, which did not describe any relevant conduct); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) (dismissing defendants about whom specific allegations were "sparse to the point of near non-existence or are grouped together with specific allegations relating to their affiliated but legally separate entities" after the plaintiff conceded at oral argument "that the sole basis for identifying the[] entities as defendants was that they were in a chain of custody of ownership of [another Defendant].").

Unlike the complaints in the cases Defendants cite, the Amended Complaint explains who Ms. Harlan-Evitts is and her role in causing Lauren Johansen's death. Thus, other general allegations against "Defendants" are not improper.

## II. The Amended Complaint states a § 1983 claim against Ms. Harlan-Evitts and Brooke's Bail Bonding

### a. The Amended Complaint adequately alleges that Defendants acted under color of state law and Defendants fail to address the correct standard in seeking dismissal

#### 1. Defendants rely on inapplicable authority and fail to address the correct standard

Defendants bear the burden on a motion to dismiss of "proving no claim exists" by "explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate." *Salazar v. Paramount Global*, 683 F. Supp. 3d 727, 735 (M.D. Tenn. 2023). As set forth in the Amended Complaint, Plaintiff brings a § 1983 claim against Defendants

arising out of their actions and inactions in carrying out their duties of supervision of an individual charged with violent criminal offenses, duties otherwise chargeable to the state. (Am. Compl. ¶¶ 128-55.) The Defendants engaged in these actions while expressly appointed to act "as an agent of the Court," and for which the conduct of Brooke's Bail "constitutes an integral part of the operation of the Court." Local Rules of Practice for Bail Bonds, set forth by the Criminal Court for Davidson County, Rule 9(A).[2] Defendants were unquestionably acting under color of state law in securing Rivers's release and failing to take action to ensure Rivers's compliance with the conditions ordered by the criminal court.

Defendants quote a sister court's unreported dismissal of a *pro se* plaintiff's § 1983 claim against two private attorneys for the statement that state action may only be found where a party acts together or obtains significant aid from state officials. (Defs.' Motion 13 (quoting *Davis v. Brudzinski*, No. 3:24-cv-1421, 2025 WL 268375 (N.D. Ohio Jan. 22, 2025)).) In reality, as this Court has recognized, concerted action with state officials is just one method of proving that a private entity acted under color of state law. *See, e.g., Shannon v. URS Energy and Constr., Inc.*, No. 3:14-cv-01292, 2015 WL 1640133, at *2 (M.D. Tenn. Apr. 9, 2015).

In a footnote, Defendants acknowledge the other analysis that courts in this Circuit use to assess whether a private entity's conduct may be fairly attributed to the state. (Defs.' Motion 13 n.5.) Defendants' only discussion of this fact-intensive, multi-pronged analysis is to baldly state, "Plaintiff has not plead [sic] any facts to suggest a theory of state action by private actors under

---

[2] Many Tennessee counties have promulgated rules governing bond companies pursuant to Tenn. Code Ann. § 40-11-124, and bond companies are approved by the local courts. The Defendants in this case were subject to the Local Rules of Practice for Bail Bonds for the Criminal Court for Davidson County.

any of these tests." (*Id.*)  Defendants' conclusory sentence in a footnote falls far short of satisfying their "burden of explanation."  *Salazar*, 683 F. Supp. 3d at 735.

The Court should not excuse Defendants' perfunctory argumentation and should only consider the narrow and inapplicable ground for dismissal raised in their motion.  *See United States v. Giampietro*, 475 F. Supp. 3d 779, 792 (M.D. Tenn. 2020) ("The Sixth Circuit has repeatedly observed, issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a skeletal way, leaving the court to put flesh on its bones."  (cleaned up)).  Out of an abundance of caution, however, Plaintiff will address the sufficiency of the Amended Complaint under the Sixth Circuit's operative test.

### 2. The Sixth Circuit's State Action Analysis

A private entity can be treated as a state actor under § 1983 where "the specific conduct of which a plaintiff complains is fairly attributable to the government."  *Ciraci*, 62 F.4th at 281 (cleaned up) (citing *Am. Mfrs. Mut ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)).

To determine state action, the court should consider three[3] inquiries: (1) "Does the private company's conduct involve a traditionally exclusive governmental function?" (2) "Is that conduct 'entwined with' government decisions or fairly attributable to the government based on a close 'nexus' between the state and the challenged conduct?" And (3) "Has the government compelled the company's action?"  *Id.* (citations omitted).  This is a "necessarily fact-bound inquiry."  *Doe v. Oberlin College*, 60 F.4th 345, 353 (6th Cir. 2023) (quoting *Brentwood Acad. v. Tenn.*

---

[3]     The Court of Appeals has at times identified four tests and at others it has combined the "nexus" and "entwinement" tests into one.  *See, e.g., Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014) (citing *Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 127 (6th Cir. 2009)).

*Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001)).  And facts relevant to any of these inquires "are significant," but no one inquiry "must necessarily be applied."  *See Brentwood Acad.*, 531 U.S. at 303.  Courts routinely find state action based on application of only one test.  *See, e.g., id.* (finding state action based only on the "entwinement" test); *Romanski v. Detroit Ent., L.L.C.*, 265 F. Supp. 2d 835, 843 (E.D. Mich. 2003) (holding that security guards granted police-like arrest authority were state actors because they were exercising authority traditionally reserved to the state).  Here, the allegations in the Amended Complaint supports the claim that Defendants are state actors under the first and second inquiry.[4]

### 3. Brooke's Bail's conduct involves a traditionally exclusive governmental function and is fairly attributable to the state because of a close nexus with the Davidson County Criminal Court

The relevant conduct here, pretrial supervision of individuals charged with dangerous crimes, is a traditional state function.

Plaintiff's review of caselaw in this circuit has revealed no cases discussing pretrial supervision as a traditional state function.  But courts in other circuits who have considered that question, or similar ones, have concluded that it is.  For example, in *Ayo v. Dunn*, 17-cv-526, 2018 WL 4355199 (M.D. La. Sept. 12, 2018), the defendant, a corporation that provided pretrial supervision services, moved to dismiss a § 1983 claim on the ground that it was not a state actor. *Id.* at*1-2.  Just like Defendants, the state court's bond order "created some indicia of authority in [the defendant,]" including, apparently, the ability to re-arrest the criminal defendant. *Id.* at *3; (*see* Am. Compl. ¶¶ 68-71.)  The court denied the motion with little discussion, holding that "pretrial detention and supervision are traditionally state functions." *Id.* at *3; *see also Meade v.*

---

[4]    Plaintiff concedes that the third inquiry, "state compulsion," does not apply to the facts of this case.

*Bonin*, No. CV 20-1455, 2020 WL 5311351, at \*4 (E.D. La. Sept. 4, 2020), (denying defendant ankle monitoring company's motion to dismiss holding that the defendant "is a state actor when it provides ankle monitoring services to criminal defendants because monitoring pretrial defendants is a 'fundamentally governmental function' that is 'traditionally reserved to the state.'")

In Davidson County, where the Defendants operate, the criminal courts acknowledge that "[e]very bonding company acts as an agent of the Court and ***the conduct of the bonding company constitutes an integral part of the operation of the Court***." Local Rules of Practice for Bail Bonds for the Criminal Court for Davidson County, Rule 9(A) (emphasis supplied). Furthermore, the fact that other states, and the federal system, rely on government officials to provide the pretrial supervision that private bail bond companies supply in Tennessee (Am. Compl. ¶ 34) is also evidence that bail bonding companies are performing a traditional state function. *Cf. Nugent v. Spectrum Juvenile Justice Servs.*, 72 F.4th 135, 141 n.2 (6th Cir. 2023) (noting that courts may look to other states in determining whether something is a traditional state function).

The second inquiry looks at the "entwinement," "symbiotic relationship," or "nexus" between the private actor and the state. This inquiry considers whether "there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself" and whether the private actor is "entwined in government policies" or the government is "entwined in the private entity's management and control." *Marie*, 771 F.3d 344, 363 (6th Cir. 2014).

In 1987, the Fourth Circuit Court of Appeals considered Maryland's similar bail bonding paradigm and observed,

> The symbiotic relationship between bail bondsmen and the Maryland criminal court system suffices to render [the defendant]'s conduct state action. Bondsmen depend, for their livelihood, upon the judicial use of a bail bond system, and they are

15

licensed by the state.  In return, bondsmen facilitate the pretrial release of accused persons, monitor their whereabout and retrieve them for trial.

*Jackson v. Pantazes*, 810 F.2d 426, 430 (4th Cir. 1987) (citing Toborg, *Bail Bondsmen and Criminal Courts*, 8 Just. Sys. J. 141, 142-43, 155-56 (1983); Note, *The Hunters and the Hunted: Rights and Liabilities of Bailbondsmen*, 6 Fordham Urb. L. J. 333 (1978)).[5]  Even forty years later, the Fourth Circuit's description could very well be about Davidson County's bail bonding system.  Bail bonding companies operated by state-licensed bondsmen in Davidson County function as *de facto* pretrial services for the Davidson Count criminal courts so that Tennessee can make good on its Constitutional guarantee of the right to bail while maintaining public safety through bond conditions, which are authorized by statute.  (Am. Compl. ¶¶ 19-37.)

And in *Norris v. Premier Integrity Sols., Inc.*, 641 F.3d 695, 697-98 (6th Cir. 2011), the Sixth Circuit considered whether a company that performed drug tests for Kentucky's state-operated pretrial release program was a state actor for purposes of a § 1983 claim.  *Id.* at 696-97.  Applying the nexus/entwinement test, the Court of Appeals summarily rejected the defendant's argument that it was not a state actor, reasoning, "[The defendant] conducted the tests for the government after the Administrative Office of the Courts had approved [the defendant]'s policies and methods.  [The defendant]'s Executive Vice President stated that judges in Kentucky viewed [the method of testing at issue] as 'essential.'"  *Id.* at 697-98.  Based on these facts, the court remarked that the state action analysis "require[d] little discussion."  *Id.* at 697.  The same is true here.

---

[5]     Admittedly, *Jackson* involved a Fourth Amendment claim against a bonding company for an arrest.  *Jackson*, 810 F.2d at 427.  The Court should still accept this as persuasive authority because the Fourth Circuit is speaking at a level of generality applicable to the facts of this case, unlike Defendants' cases, which discuss bonding companies in the arrest/seizure/Fourth Amendment context.

Like in *Norris*, Brooke's Bail has a close nexus with the state because it is performing a function that is essential to Davidson County's criminal justice system. Davidson County's Local Rules for Bail Bonding acknowledge as much, stating, "Every bonding company acts as an agent of the Court and the conduct of the bonding company constitutes an integral part of the operation of the Court." Local Rules of Practice for Bail Bonds for the Criminal Court for Davidson County, Rule 9(A). And in as much as the Sixth Circuit found it significant that the Kentucky Court system had "approved [the defendant]'s policies and methods," the entwinement between the criminal court and Brooke's Bail is much greater. *Norris*, 641 F.3d at 697-98. Rather than merely delegating the supervision to bondsmen, the courts remain entwined in the management and control of the bonding companies, setting forth specific rules that bonding companies must follow concerning the ownership of the companies, the collateral maintained by the companies, the manner in which agents of the companies may behave, the periodic drug screening of agents of the bond companies, and the records that companies must maintain. *See* Tenn. Code Ann. §§ 40-11-301 *et seq.*, 40-11-401 *et seq.*, Local Rules of Practice for Bail Bonds for the Criminal Court for Davidson County. (Am. Compl. ¶¶ 26-30.) The criminal court's *en banc* order, attached as Exhibit A to Defendants' motion, reflects the extent of Brooke's Bail's "entwinement" with the criminal court. (*See* Defs.' Motion Ex. A, ECF No. 56-1.) There, the court exercised its "inherent authority to regulate bonding companies," convened a hearing, and considered whether it was "in the public interest to suspend or terminate [Brooke's Bail's] current approval to do business." (*Id.* at 1-2.)

Tennessee and Davidson County's entwinement with the bail bonding system, and Brooke's Bail in particular, goes far beyond Brooke's Bail's "mere compliance with state law." The Amended Complaint is clear that bail bonding companies like Brooke's Bail are an essential

17

part of Davidson County's criminal court system because they carry out the traditional state function of pretrial supervision of criminal defendants. Accordingly, the Amended Complaint sufficiently supports the allegation that Defendants are state actors for purposes of Plaintiff's § 1983 claim.

Defendants' reliance on this Court's opinion in *White v. Wilson*, No. 1:18-CV-00093, 2021 WL 809674 (M.D. Tenn. Mar. 3, 2021), does not change this analysis. In *White*, the Court denied a bonding company's motion for partial summary judgment of the plaintiff's § 1983 claim because the Plaintiff had produced evidence that the bonding company worked with state officials. *Id.* at *3-5. Thus, the Court never had to consider whether the bonding company was a state actor under the Sixth Circuit's other tests.

*White* is also inapplicable because, like the other cases Defendants cite, it only dealt with §1983 claims against bail bond companies premised on the manner in which the plaintiff, a criminal defendant, was arrested. *Id.* at *3; *see also Morant v. Moyer*, No. 2:21-CV-05211, 2021 WL 5937757 (S.D. Ohio Dec. 16, 2021) (dismissing *pro se* prisoner's complaint against bondsmen who "entered Plaintiff's residence without [a] warrant," but noting that "some actions by bondspersons may satisfy the nexus test in some instances . . . ."); *Marcum v. Ohio*, No. 2:24-CV-4048, 2025 WL 1347266 (S.D. Ohio May 8, 2025) (dismissing *pro se* prisoner's § 1983 claim against bondsmen because the bonding company did not enlist state assistance in arresting the plaintiff).

But cases considering arrests and seizures are inapplicable to this case because Plaintiff's § 1983 claim relates to Brooke's Bail's function in supervising violent criminal defendants, not to any alleged seizure or arrest. *See Littler v. Ohio Assoc. of Pub. Sch. Emps.*, 88 F.4th 1176, 1182 (6th Cir. 2023) ("[T]his court must focus its state-action analysis on the 'specific conduct' of which

18

the plaintiff complains.'" (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999))). So, caselaw discussing private actors who aid a court system in the pretrial supervision of criminals, as discussed above, is more apt.

The Amended Complaint states that Defendants exercised state authority under the Sixth Circuit's test for state action, and aside from footnoted *ipse dixit*, Defendants have made no argument that it does not. Accordingly, the Court should deny the motion as to this ground.

> **b.     The Amended Complaint identifies a federally protected right**

The Amended Complaint identifies a federally protected right: Lauren Johansen's right not to be deprived of life, liberty, or property without due process of law under the Fourteenth Amendment. (*See* Am. Compl. ¶ 154.) Included within Ms. Johansen's liberty interests incorporated into the Fourteenth Amendment are "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free [wo]men." *Kallstron v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir. 1998) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (6th Cir. 1998)). Among these "historic liberties" is "to be free from 'unjustified intrusions on personal security.'" *Id.* Indeed, the Sixth Circuit has said that "it goes without saying that an individual's 'interest in preserving her life is one of constitutional dimension.'" *Id.* at 1063 (quoting *Nishiyama v. Dickson County*, 814 F.2d 277, 280 (6th Cir. 1987)). Thus, Ms. Johansen had "a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity" including the right to preservation of her life. *See id.* (quoting *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996)). The Amended Complaint unambiguously states that Lauren Johansen's Substantive Due Process rights under the Fourteenth

Amendment were violated when she was kidnapped, beaten, and murdered by the man that Defendants allowed to run free.[6]

In any case, a Plaintiff is not required to plead "magic words" to state a claim; instead, the Court should examine the substance of the Amended Complaint. *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 629 (6th Cir. 2013)). And the Court of Appeals has expressly held that a plaintiff bringing a §1983 claim need not name a specific constitutional right to comply with Rule 8's pleading standard. *Bannister v. Knox Cnty. Bd. Of Educ.*, 49 F.4th 1000, 1009-1010 (6th Cir. 2022). (*See* Am. Compl. ¶¶ 107, 154.) Thus, the Court should reject this argument.

### III. The Amended Complaint states facts that support vicarious liability under a theory of joint venture and partnership liability

#### a. Plaintiff may plead theories of vicarious liability as separate counts

The Amended Complaint makes clear that the counts for joint venture and partnership are intended to create joint and several (in this case, vicarious) liability for the Amended Complaint's substantive counts. (*See* Am. Compl. ¶¶ 161, 167, 172.)

To the extent that Defendants are arguing that Plaintiff has failed to comply with some technical rule of pleading by listing these theories of vicarious liability as separate counts, the Court should reject such an argument. First, the Amended Complaint contains similar assertions of vicarious/joint and several liability within the substantive counts. (Am. Compl. ¶¶ 126-27.) Second, theories of vicarious liability are frequently alleged as separate counts; most commonly,

---

[6] The Sixth Circuit recognizes that a plaintiff may establish § 1983 liability for injuries caused by third party acts of violence under a "state created danger" theory of liability. *See, e.g., Nelson v. City of Madison Heights*, 845 F.3d 695, 699-700 (6th Cir. 2017). And Brooke's, as a business entity, may be liable under a theory of *Monell* liability. *See Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 891 n.4 (6th Cir. 2025). Defendants do not argue in their motion that the Amended Complaint fails to state a claim under these theories. So, Plaintiff has not addressed the theories in his response.

civil conspiracy.  *See, e.g., 1st Am. Title Ins. Co. v. Cumberland Cnty. Bank*, 633 F. Supp. 2d 566, 588 (M.D. Tenn. 2009).  Finally, even if separate counts are technically improper, the substance of the Amended Complaint is clear:  Other Defendants may be liable for Brooke's Bail's wrongs (and vice versa) under the theories of joint venture and partnership.  The purpose of pleading is not to pit counsel in a "game of skill" that tests technical compliance, it is to "facilitate a proper decision on the merits."  *Foman v. Davis*, 371 U.S. 178, 181-82 (1962).  The Amended Complaint alleges facts showing that Brooke's Bail was part of a partnership and two joint ventures.  So, if in fact Plaintiff has failed to jump through some technical hurdle, the Court should excuse the same.

> **b.      The Amended Complaint alleges partnership and joint venture liability**

> **1.      The Partnership between Brooke's Bail and CHIC**

Under Tennessee law, a partnership is "an association of two or more persons to carry on as co-owners of a business or other undertaking for profit."  *Lewis v. Calvert*, No. 3:17-CV-000019, 2019 WL 295089, at *2 (M.D. Tenn. Jan. 23, 2019) (citing Tenn. Code Ann. § 61-1-101(7)).  A partnership is created by contract, which can be express or implied.  *Id.* (citing *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991)).  An implied contract of partnership exists if the parties intended to "do the things that constitute a partnership."  *Id.* (citing *Bass*, 814 S.W.2d at 41).  This is true regardless of whether the parties' express purpose is to create or avoid creating a partnership.  *Id.* (quoting *Bass*, 814 S.W.2d at 41).  In sum, "the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money."  *Reed v. Thurman*, No. E2014-00769-COA-R3CV, 2015 WL 1119449 (Tenn. Ct. App. Mar. 10, 2015) (quoting *Bass*, 814 S.W.2d at 41).  Whether a partnership exists is a fact intensive inquiry.

21

*See Bass*, 814 S.W.2d at 41 ("[E]ach case must be decided upon consideration of all relevant facts, actions, and conduct of the parties.").

Importantly, proof of profit sharing creates a presumption that a partnership exists. Tenn. Code Ann. § 61-1-202(c)(3). Likewise shared losses is an important factor in demonstrating a partnership. *See Wantiez v. Carlson*, No. C.A. 637, 1986 WL 1151 (Tenn. Ct. App. Jan. 28, 1986) ("[P]erhaps the most significant fact is that Mr. Wantiez actually shares in and suffered the consequences of the business having losses"). The Amended Complaint alleges that Brooke's Bail and CHIC shared profits and losses in form of bond premiums paid, and bonds forfeited to the Court. (*See* Am. Compl. ¶¶ 46-47, 170.) Thus, Plaintiff enjoys a presumption that Brooke's Bail and CHIC were partners. Given that it is impossible for a defendant to rebut a presumption under the 12(b)(6) standard, *see, e.g. Stein v. Sparks*, No. 1:08-CV-142, 2008 WL 4356964, at *2 (E.D. Tenn. Sept. 17, 2008); *accord SCF Ariz. V. Wachovia Bank, N.A.*, No. 09 CIV. 9513 WHP, 2010 WL 5422505, at *9 (S.D.N.Y. Dec. 14, 2010), the Court may end its analysis here.

The Amended Complaint also alleges other facts that, viewed together, amply support a claim that Brooke's Bail and CHIC operate as partners. Brooke's Bail's role in the partnership is to find clientele, appear in court, secure the release of criminal defendants, ensure the criminal defendant complied with conditions of bond, and ensure that the criminal defendant appeared in court, and CHIC provided financial backing and executes powers of attorneys to allow Brooke's Bail to bond out more criminal defendants than it could alone. (Am. Compl. ¶¶ 43-45.) Brooke's Bail and CHIC's arrangement is a familiar, even prototypical, one: An active partner who manages the day-to-day affairs of the partnership and a deep-pocketed silent partner who provides financial backing. *See, e.g.,* 68 C.J.S. § 9 (May 2025) ("Partnerships are often created in which a silent partner contributes money, credit, or property, and an active partner contributes labor and openly

manages the business." (citing *In re Lamb*, 36 B.R. 184, 189 (Bankr. E.D. Tenn. 1983))). Ultimately, Plaintiff cannot allege what he does not know about the inner-workings of Brooke's Bail and CHIC's business relationship, but the publicly available information about Brooke's Bail and CHIC's relationship indicates that they share profits and losses in a partnership between dormant and active partners.

These allegations, given the benefit of every reasonable inference, state a claim of a relationship well beyond "merely an arms-length relationship between a bond business and an insurer." (Defs.' Mot. Dismiss 18.)

### 2. Brooke's Bail's Joint Ventures

Joint ventures are like partnerships, "for a more limited period of time, and a more limited purpose." *Via v. Oehlert*, 347 S.W.3d 224, 230 (Tenn. Ct. App. 2010) (quoting *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, S.W.3d 588, 605 (Tenn. Ct. App. 2001)). The elements of a joint venture are: (1) "a common purpose"; (2) "some manner of agreement among the parties"; and (3) the equal right on the part of each party to control the venture as a whole and any relevant instrumentality." *Id.* at 599 (citing *Fain v. O'Connell*, 909 S.W.2d 790, 793 (Tenn. 1995)).

### i. The Joint Venture between Brooke's Bail and On Time

The allegations giving rise to the joint venture between Brooke's Bail and On Time are straightforward. Indeed, Defendants only mention On Time Bonding in their motion to quote the Amended Complaint's statement that "On Time Bonding, like BB Bonding, is a bail bonding service 'authorized by the Davidson County Criminal Courts to market [its] services in Davidson County.'" (Defs.' Mot. Dismiss (quoting Am. Compl. ¶ 37)).

Brooke's Bail and On Time each agreed to cover $75,000 of Rivers's $150,000 bond. (Am. Compl. ¶¶ 65-66, 158.) Both Brooke's Bail and On Time signed the criminal court's order setting

23

Rivers's bond conditions and requiring both entities to surrender Rivers back into custody if he violated those conditions. (*Id.* ¶¶ 68-73, 159.) As bonding companies, both Brooke's Bail and On Time had equal capacity to arrest Rivers without a warrant to surrender him back into State custody. (*Id.* ¶ 36, 160.) In other words, Brooke's Bail and On Time agreed to join their money together for the common purpose of paying Rivers's bond, had identical obligations to the Court to enforce the conditions of Rivers's bond, and at all times had equal rights under Tennessee statute to arrest Rivers and return him to custody.

Because the Amended Complaint plainly states a claim of joint venture as to Brooke's Bail and On Time, and because Defendants have offered no real argument to the contrary, the Court should allow this joint venture claim to proceed.

ii.      The Joint Venture between Brooke's Bail and Freedom Monitoring

The Amended Complaint's also states a claim that Brooke's Bail and Freedom Monitoring established a joint venture to monitor Rivers's location via the use of a GPS monitoring device. Brooke's Bail and Freedom Monitoring had the common purpose of putting Rivers under GPS monitoring so that he would be in compliance with the conditions of his bond. (*Id.* ¶¶ 68, 79.) The second and third elements, agreement and equal right to control, are demonstrated by the fact that Wilhoite was at all times both Freedom Monitoring's owner and an agent of Brooke's Bail. (*Id.* ¶ 79.) And when Ms. Ridley, an agent of Brooke's Bail, contacted Ms. Wilhoite about GPS monitoring for Rivers, Ms. Wilhoite instructed Ms. Ridley to use a GPS monitoring device, which was already in Brooke's Bail's office. (*Id.* ¶ 80.) Ms. Ridley was the one who actually installed the monitor. (*Id.*) These facts plausibly state the elements of a joint venture between Brooke's Bail and Freedom Monitoring to keep Bricen Rivers under GPS monitoring.

### c. Tennessee has not abolished joint venture or partnership liability

Finally, Defendants are simply wrong that Tennessee's adoption of comparative fault abolished joint venture or partnership liability. The statute that Defendants cite, Tenn. Code Ann. § 29-11-107, expressly excludes doctrines of vicarious liability from Tennessee's abolition of joint and several liability. Tenn. Code Ann. § 29-11-107(c); *see also Banks v. Elks Club Pride of Tenn. 1102*, 301 S.W.3d 214, 219-220 (2010) ("To the extent that the doctrine of vicarious liability can be considered a species of joint and several liability, we have held that the adoption of comparative fault . . . did not undermine the continuing viability of various vicarious liability doctrines . . . ."); Laurence Pivnick, *Tennessee Circuit Court Practice* § 5:16 (Mar. 2025 update) ("Both the [Tennessee] Supreme Court and the General Assembly concur that in cases involving vicarious liability, the doctrine of joint and several liability, not several liability, applies.").

Tennessee law still recognizes that partners and joint venturers are jointly and severally liable for obligations arising out of their partnership or joint venture. Tenn. Code Ann. § 61-1-306(a) ("[P]artners are liable jointly and severally for all obligations of the partnership . . . ."); *see also Greenwood Mills, Inc. v. Burris*, 130 F. Supp. 2d 949, 956-57 (M.D. Tenn. 2001); *Via v. Oehlert*, 347 S.W.3d 224, 230 (Tenn. Ct. App. 2010) (noting that joint ventures "are governed by the same rules of law as those governing partnerships."); *see also Perdue v. Kneedler*, No. M201800722COAR3CV, 2019 WL 4447409, at *2-4 (Tenn. Ct. App. Sept. 17, 2019) (affirming joint and several liability against joint venturers). Thus, the Court should reject this argument.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

25

Respectfully submitted,

**Womble Bond Dickinson (US) LLP**

*/s/ Philip N. Elbert*
Philip Elbert, # 009430
Elizabeth Tipping, # 023066
Satchel Fowler, # 039624
1222 Demonbreun Street, Suite 1201
Nashville, TN 37203
Telephone: (629)-312-1823
phil.elbert@wbd-us.com
liz.tipping@wbd-us.com
satchel.fowler@wbd-us.com

26

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing has been sent via the method indicated below on the following this the 28th day of October 2025.

| Via the Court's E-Filing System | Via U.S. Mail |
|---|---|
| Matt Pietsch<br>**Gordon Rees Scully Mansukhani**<br>4031 Aspen Grove Drive, Suite 290<br>Franklin, TN  37067<br>mpietsch@grsm.com<br><br>*Counsel for American Contractors Indemnity Company* | Tyrell White d/b/a On Time Bonding<br>704 Pin Oak Dr.<br>Antioch, TN 37013 |
| Joseph Zanger<br>**Zanger Law Firm**<br>135 Clif Garret Drive<br>White House, TN 37188<br>joe@zangerlaw.com<br><br>*Counsel for Nakeda Wilhoite and Freedom Monitoring, LLC* | Neicola McMillian<br>1018 32nd Ave N.<br>Nashville, TN 37209 |
| Bryan Lewis<br>**Bryan Lewis Law**<br>1300 Division St. Suite 307<br>Nashville, TN 37203<br>bryan@bryanlewislaw.com<br><br>Will Helou<br>**WSMLegal PLLC**<br>2817 West End Avenue, Suite 126-107<br>Nashville, TN 37203<br>whelou@wsmlegal.com<br><br>*Counsel for Brooke's Bail Bonding, LLC, Brooke Harlan-Evitts, and Continental Heritage Insurance Company* | Alisha Ridley<br>101 Davis Park Drive Unit 119<br>Smyrna, TN 37167 |

*/s/ Philip N. Elbert*