# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ROBERT LANCE JOHANSEN as     )
administrator of the estate of     )
LAUREN JOHANSEN,     )
    )
    Plaintiff,     )
    )
v.     )     **Case No. 3:25-cv-00690**
    )     **Judge Aleta A. Trauger**
BROOKE'S BAIL BONDING, LLC,     )
FREEDOM MONITORING SERVICES,     )
LLC, TYRELL WHITE d/b/a ON TIME     )
BAIL BONDING, BROOKE HARLAN-     )
EVITTS, JAY OTEY, NEICOLA     )
McMILLIAN, NAKEDA WILHOITE,     )
ALISHA RIDLEY, AMERICAN     )
CONTRACTORS INDEMNITY CO., and     )
CONTINENTAL HERITAGE     )
INSURANCE COMPANY,     )
    )
    Defendants.     )

## MEMORANDUM

In this undeniably tragic case, plaintiff Robert Lance Johansen brings suit as the administrator of the estate of his daughter, Lauren Johansen. Lauren was kidnapped and murdered by non-party Bricen Rivers—while Rivers was released on bond on prior charges arising from his repeated battering of Lauren Johansen.

The defendants in this case are the bail bonding companies that agreed to post the bond for Rivers' release while the initial charges were pending, the insurance companies that guaranteed the bonds, the owners and several employees of the bail bonding companies, and the monitoring service that worked with one of the bail bonding companies. The plaintiff brings a wrongful death claim under state law as well as a claim under 42 U.S.C. § 1983 against all defendants. The claims

against the insurance companies are premised entirely upon assertions that they operated in partnership with the bail bonding companies. The plaintiff also alleges that the bail bonding companies operated a joint venture, making them jointly and severally liable for any judgment entered against either of them. The court has both diversity and federal question jurisdiction.

Now pending are separate Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6), filed by each of the two insurance companies, Continental Heritage Insurance Company ("Continental") and American Contractors Indemnity Co. ("American"), and by one of the bail bond companies and its principal, Brooke's Bail Bonding, LLC ("Brooke's Bonding") and Brooke Harlan-Evitts. As set forth herein, the court will grant in part and deny in part the Motion to Dismiss filed by Brooke's Bonding and Harlan-Evitts (Doc. No. 56), and will grant in their entirety the Motions to Dismiss filed by Continental (Doc. No. 57) and American (Doc. No. 59).

## I.      LEGAL STANDARD – RULE 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."

*Twombly*, 550 U.S. at 555 (2007). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

## II.      FACTS AND PROCEDURAL HISTORY

The plaintiff filed the Complaint initiating this lawsuit in June 2025. (Doc. No. 1.) After an initial round of motions to dismiss, he filed the First Amended Complaint ("FAC"), now the operative pleading, in September 2025. (Doc. No. 47.) As alleged in the FAC, defendants Brooke's Bonding and On Time Bail Bonding ("On Time") are bail bonding services authorized by the Davidson County Criminal Courts to market and perform bail bonding services in Davidson County. (*Id.* ¶ 37.) Brooke Harlan-Evitts is the sole member and owner of Brooke's Bonding (*id.* ¶¶ 1, 4); Tyrell White is the owner of On Time (*id.* ¶ 2). Freedom Monitoring Services, LLC ("Freedom") is owned by Nakeda Wilhoite, who was also at all relevant times employed by

Brooke's Bonding. (*Id.* ¶ 5.) Freedom "provides ankle monitors and GPS monitoring services to Brooke's Bonding as part of Brooke's Bonding's bail bonding activities." (*Id.* ¶ 37.)

Neicola McMillian and Alisha Ridley were at all relevant times agents of, or employed by, Brooke's Bonding, and Jay Otey worked as an employee or agent of On Time. (*Id.* ¶¶ 6–8.) Harlan-Evitts, Wilhoite, McMillian, Ridley, and Otey are all "bail bondsmen who are licensed by the Davidson County Criminal Courts, pursuant to Tennessee statute, to post bonds on behalf of criminal defendants." (*Id.* ¶ 37.)

Continental and American are insurance companies that purportedly "partner," respectively, with Brooke's Bonding and On Time to provide bail bonding services in Davidson County, Tennessee, "in order to share in the profits obtained by those bail bonding services." (*Id.* ¶¶ 9–10, 41; *see also id.* ¶¶ 38–40, 43–47, 49–52.)

In December 2023, Bricen Rivers repeatedly battered Lauren Johansen[1] while they were visiting Nashville together from Mississippi, where they lived. (*Id.* ¶¶ 53–54.) Rivers was arrested on felony charges in connection with his assaulting Johansen, including charges of especially aggravated kidnapping, aggravated stalking, and coercion of a witness, but he was ultimately released on bail, half of which was posted by Brooke's Bonding and half by On Time. (*Id.* ¶¶ 55–58, 65–66, 75–77.)

Rivers' release on bond was subject to conditions, including that, among other things, he wear a GPS bracelet, stay in Davidson County, and have absolutely no contact with Johansen, as stated in open court and in a written order dated June 5, 2024 ("bond conditions order"). (*Id.* ¶¶ 68–69.) Defendant McMillian signed the bond conditions order on behalf of Brooke's Bonding, and

---

[1] The court herein refers to Lauren Johansen as "Johansen" and to her father, Robert Johansen, as the "plaintiff."

defendant Otey signed it on behalf of On Time, but neither requested copies of the order, and they apparently signed it without being apprised of its contents. (*Id.* ¶¶ 72–73, 76.) Rivers was not released that day, however.

On June 24, 2024, Brooke's Bonding and On Time each posted a $75,000 bond to the Davidson County Warrant and Bond Office, a division of the Davidson County Sheriff's Office. (*Id.* ¶ 75.) Later that afternoon, defendant Ridley received a telephone call from Rivers, who had been released from jail. She picked him up and brought him to Brooke's Bonding's office. (*Id.* ¶¶ 77–78.) Although the bond conditions order directed GPS monitoring by a specific GPS monitoring company, Ridley called Wilhoite, who both owned Freedom and was an employee of Brooke's Bonding. Wilhoite instructed Ridley to use one of the Freedom GPS ankle monitors that were already in Brooke's Bonding's office. (*Id.* ¶¶ 79–80.) Ridley affixed a Freedom monitor on Rivers' ankle but did not program it to send an alert if Rivers left Davidson County. In fact, Brooke's Bonding, in conjunction with Rivers' mother, Chelsa Rivers, facilitated Rivers' travel by bus back to Mississippi. (*Id.* ¶¶ 81–83.) Despite no allegations of On Time's direct involvement in the process, the FAC asserts that the "Bail Bonding Defendants" collectively—*i.e.*, all defendants except the two insurance companies (*id.* ¶ 37)—"released Bricen Rivers from Brooke's Bonding's office and facilitated his travel to Mississippi" using money sent by his mother (*id.* ¶ 83.)

The FAC, despite alleging that Otey and McMillian had failed to obtain a copy of the bond conditions order and despite the absence of any allegations regarding On Time's involvement in monitoring Rivers, also asserts that the "Bail Bonding Defendants" collectively "knew Bricen Rivers had left Davidson County Tennessee and therefore was in violation of the conditions of his bond." (*Id.* ¶ 85.)

The "Bail Bonding Defendants" began having issues with the ankle monitor on June 27, 2024, so "they" asked Rivers to return to Brooke's Bonding to make necessary adjustments. (*Id.* ¶ 86.)

On June 28, 2025, Harlan-Evitts received an email from the Davidson County Warrant and Bond Office informing her of the conditions of Rivers' bond, and either Harlan-Evitts or other Brooke's Bonding employees notified Freedom and On Time of those conditions. (*Id.* ¶¶ 87–88.) Despite knowledge of these conditions, including that Rivers not leave Davidson County, and despite explicit instructions from the court that Rivers be surrendered to the Davidson County Sheriff's Office if he violated the bond conditions order, Harlan-Evitts did not instruct the employees of Brooke's Bonding to immediately return Rivers to state custody.

On June 29, 2025, Rivers arrived back at Brooke's Bonding's office to meet with Wilhoite. The other "Bail Bonding Defendants were aware" that Rivers had returned to Brooke's Bonding. (*Id.* ¶¶ 90–92.) Wilhoite affixed a new GPS monitor to Rivers' ankle, but she did not program it to inform the "Bail Bonding Defendants" if Rivers left Davidson County. (*Id.* ¶¶ 95–96.) Rather than alert the Davidson County Sheriff's Office or the court of Rivers' presence or the fact that he had already violated the conditions of release by leaving Davidson County, Wilhoite released him and allowed him to return to his vehicle. (*Id.* ¶ 98.)

Rivers immediately began traveling toward Mississippi. The "Bail Bonding Defendants" knew or should have known that he was leaving Davidson County and entering Mississippi, but they did not contact Tennessee authorities, Mississippi authorities, or Johansen or her family to apprise or warn them of the situation. (*Id.* ¶¶ 102–06.) On July 2, 2024, three days after Rivers left Brooke's Bonding with a new ankle monitor, he kidnapped and murdered Johansen. (*Id.* ¶ 107.)

Based on these allegations, as discussed in greater detail in connection with the different Rule 12(b)(6) motions, the FAC asserts two substantive claims: a state law wrongful death claim against all defendants (Count I) and a claim under 42 U.S.C. § 1983 against all defendants (Count II). The FAC also asserts four "counts" that are not actually claims for relief but theories of joint and several liability. Under Count III, for "Joint Venture," the plaintiff asserts that Brooke's Bonding and On Time were involved in a joint venture and therefore will be jointly and severally liable for any judgment entered against either. Similarly, Count IV, for "Joint Venture," asserts that Brooke's Bonding and Freedom were engaged in a joint venture, making each jointly and severally liable for any judgment entered against either. Counts V and VI, respectively, assert "Partnership Liability" between Brooke's Bonding and Continental (Count V) and between On Time and American (Count VI). Based on broad assertions that the bail bond companies were in "partnership" with the insurance companies, the plaintiff claims that the insurance companies will be jointly and severally liable for any judgment awarded against the bail bonding companies.

The Rule 12(b)(6) motion filed by Brooke's Bonding and Harlan-Evitts (collectively, the "Brooke's defendants") seeks dismissal of Counts I and II against Harlan-Evitts and Counts II, III, IV, and V against Brooke's Bonding. (Doc. No. 56.) It does not seek dismissal of Count I (wrongful death) against Brooke's Bonding. Continental's motion (Doc. No. 57) seeks dismissal of Count V, the partnership liability claim against it; and American's motion (Doc. No. 59), filed with a separate Memorandum (Doc. No. 60), seeks dismissal of Count VI, the partnership claim against it.[2] The plaintiff filed a Response in opposition to each motion. (Doc. Nos. 62, 63, 67.) The three

---

[2] Other than Harlan-Evitts, none of the individual defendants seeks dismissal at this juncture, nor have Freedom and On Time filed Rule 12(b)(6) motions.

sets of defendants each filed a Reply (Doc. Nos. 65, 65, 71), and the plaintiff filed a Sur-reply to the Brooke's defendants' Reply (Doc. No. 70).

The court will address, first, the Brooke's defendants' challenge to the substantive claims against them. The court will then address the plaintiff's joint-and-several-liability theories challenged in all three motions.

## III. COUNT I: THE WRONGFUL DEATH CLAIM AGAINST HARLAN-EVITTS INDIVIDUALLY

### A. Negligence under Tennessee Law

To state a *prima facie* claim of negligence under Tennessee law, a plaintiff must plead facts that, if true, plausibly establish "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (citation omitted); *see also Heflin v. Iberiabank Corp.*, 571 S.W.3d 727, 734 (Tenn. Ct. App. 2018). "Whether a defendant owes a duty to a plaintiff in any given situation is a question of law for the court." *Riggs v. Wright*, 510 S.W.3d 421, 427 (Tenn. Ct. App. 2016) (citation omitted). But "[q]uestions regarding breach of duty, causation in fact, and legal causation are ordinarily . . . for the jury." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003); *see also Eden W. ex rel. Evans v. Tarr*, 517 S.W.3d 691, 695–96 (Tenn. Ct. App. 2015).

"Generally speaking, persons have a duty to others to refrain from engaging in affirmative acts that a reasonable person should recognize as involving an unreasonable risk of causing an invasion of an interest of another or acts which involve an unreasonable risk of harm to another." *Id.* (internal quotation marks and citations omitted). "A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." *Cotten v. Wilson*, 576 S.W.3d 626, 638

(Tenn. 2019)) (quoting *King v. Andersen Cnty.*, 419 S.W.3d 232, 248 (Tenn. 2013)). "Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise . . . ." *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992); *see also Tebeau v. Millerwood Invs., LLC*, No. W2024-00642-COA-R3-CV, 2025 WL 985381, at *4 (Tenn. Ct. App. Mar. 28, 2025).

Ordinarily, "[t]he general duty of care does not include an affirmative duty to act for the protection of another . . . unless the defendant stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger." *Biscan v. Brown*, 160 S.W.3d 462, 478–79 (Tenn. 2005) (internal quotation marks and citations omitted). However, the Tennessee Supreme Court has recognized tort claims based on § 324A of the Restatement (Second) of Torts. *Grogan v. Uggla*, 535 S.W.3d 864, 873 (Tenn. 2017) (citing *Biscan v. Brown*, 160 S.W.3d 462, 483 (Tenn. 2005)). "The underpinning of Section 324A is a 'well-worn' principle that Tennessee courts have applied 'in a variety of factual contexts,' namely, '[o]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully.'" *Id.* (quoting *Bennett v. Trevecca Nazarene Univ.*, 216 S.W.3d 293, 300 (Tenn. 2007)).

The provision "may be applied where a party has undertaken to provide services to another," and it "provides structure for determining potential liability to a third party who has suffered physical harm from the negligent performance of the undertaking." *Id.* at 873–74. The provision states as follows:

§ 324A Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 874 (quoting Restatement (Second) of Torts § 324A). Like the existence of duty generally, "the question of whether one has assumed a duty to act is . . . a question of law." *Id.* (quoting *Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000)).

### B.       The Parties' Arguments

As relevant to the claim against Harlan-Evitts individually, Count I of the FAC asserts that, in Davidson County, Tennessee, a "private bail bonding service who posts a criminal defendant's bond" shares "the responsibilities of ensuring the public, including any victim of the defendant's crime, is protected from the violent criminal defendant who is released on bail." (FAC ¶ 35.) The plaintiff alleges that the Bail Bonding Defendants, a term defined to include Harlan-Evitts, "each had a duty to ensure that Bricen Rivers complied with the conditions of his bail"; each "had a duty to surrender Bricen Rivers" to lawful authorities if they discovered that he had violated those conditions; each had a duty to monitor his location; knew that he posed a significant risk of harm to Johansen; and knew that he had violated the conditions of his release. (FAC ¶¶ 110–14.) It asserts that the Bail Bonding Defendants all "acted negligently, recklessly, and/or maliciously" by (1) failing to make reasonable inquiries into the actual conditions of release at the time they agreed to post a bond for his release; (2) releasing him on June 29, 2024, despite actual or constructive knowledge that he had violated the conditions of his release; (3) releasing him with no safeguards in place to prevent his return to Mississippi or to notify them if he returned to Mississippi; and (4) failing to inform state authorities or Johansen that Rivers had returned to Mississippi. (*Id.* ¶¶ 115–20.) The plaintiff asserts that, because of the Bail Bonding Defendants' negligent, reckless, and/or

malicious acts and/or omissions, Rivers was able to return to Mississippi and find and murder Johansen, and that all defendants are liable for the damages recoverable by law from Johansen's wrongful death. (*Id.* ¶¶ 121–22.)

The Brooke's defendants argue that the FAC is devoid of factual allegations that, if true, would establish that Harlan-Evitts individually owed a duty of care to Johansen or that she engaged in any affirmative conduct causally connected to Johansen's death. (Doc. No. 56 at 9–10.) They assert that the only allegations in the FAC about Harlan-Evitts' own actions (or inactions)—as distinct from group pleading about the "Bail Bonding defendants" generally—are that she personally authorized the release of Rivers on June 29 and failed to instruct her employees to arrest and surrender him to the Davidson County Sheriff's Office. (*See* FAC ¶¶ 89, 99.) Otherwise, according to the Brooke's defendants, the FAC relies exclusively on "improper group pleading that does not distinguish among and between the various bondspersons—one of whom is Ms. Harlan-Evitts—and other bonding company defendants." (Doc. No. 56 at 10 (citing, *e.g.*, FAC ¶¶ 112, 113).)

By way of example of "group pleading" allegations, the FAC alleges that all of the Bail Bonding Defendants were aware that Rivers had returned to Brooke's Bonding's office on June 29, 2024, knew that Rivers had violated the conditions of his release prior to then, and nonetheless released him (as authorized by Harlan-Evitts). (FAC ¶¶ 91, 97, 98–99.) In addition, because he was wearing a GPS monitor, all of the Bail Bonding Defendants purportedly knew or should have known Rivers' location and that he was leaving Davidson County and heading for Mississippi, and they all failed to do anything about it. (*Id.* ¶¶ 102–06.) The specific "group" allegations to which the Brooke's defendants refer are that the Bail Bonding Defendants "had a duty to monitor Bricen Rivers's location" and "knew that Bricen Rivers posed a significant risk of harm to Lauren

Johansen." (*Id.* ¶¶ 112–13.) The Brooke's defendants assert that, "[b]ecause Plaintiff has not alleged any factual allegations tying Ms. Harlan-Evitts' actions or inactions to Ms. Johansen's death," the wrongful death claim against her should be dismissed. (Doc. No. 56 at 11.)

In response, the plaintiff acknowledges that the claim against Harlan-Evitts is based on allegations that she authorized the release of Rivers on June 29, 2024 and then, despite knowledge that he was again in violation of his bond conditions, "took no legitimate efforts to compel him to comply with the conditions of his release for multiple days." (Doc. No. 62 at 4–5[3] (citing FAC ¶¶ 99, 101–06).) He argues that Tennessee "recognizes a species of negligence based on failure to protect a plaintiff from a third party when the defendant 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'" (*Id.* at 6 (quoting *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997)).) He argues that such a special relationship was created here by "Defendants' [collective] decision to post bond to obtain Rivers' release from jail." (*Id.* at 7.) In particular, he points to this language of the bond conditions order:

> The bonding company is to surrender the defendant to the custody of he Davidson County Sheriff's Office **upon notification** by the monitoring company **of any violations** of the Court Order. **By signing this Order, the bonding company acknowledges the conditions of bond and its responsibility to surrender the defendant as soon as possible after notification by the monitoring company.**

(*Id.* at 7–8 (emphasis added by the plaintiff) (quoting FAC ¶ 71).) The plaintiff asserts that Harlan-Evitts, who "exercised managerial authority over Brooke's [Bonding's] operations at all relevant times," had actual knowledge of the conditions of Rivers' bond and that he had violated those conditions. (*Id.* at 8.) Upon learning that he was out of compliance, she had an affirmative duty to

---

[3] The plaintiff did not count the cover page of his Memorandum as page 1, as a result of which the plaintiff's page numbers are inconsistent with the page numbers supplied by the court's electronic monitoring system. The court refers to this document by the latter.

order Brooke's Bonding's agents to arrest Rivers or take some action to return him to custody. (*Id.*) He also asserts that Johansen was a "readily identifiable foreseeable victim" of violence at Rivers' hands. (*Id.* (quoting *Turner*, 957 SW.2d at 820).)

The Brooke's defendants' Reply asserts that the plaintiff's reliance on the existence of a "special relationship" "mischaracterizes the nature and purpose of bonding companies." (Doc. No. 64 at 2.) The Brooke's defendants argue that the opinions on which the plaintiff relies are inapposite, as they all involve doctors whose patients harmed third parties. Because doctors have a special relationship with their patients recognized by law, they argue, these cases have no bearing on the question of whether bail bond companies and their principles have a special relationship to the criminal defendant on whose behalf they post a bond. According to the defendants, the primary purpose of a bail bond is to ensure a defendant's appearance in court and compliance with his conditions of release, not to guarantee the safety of victims or prevent further harm. (Doc. No. 64 at 3 (citations omitted).)

## C. Discussion

As an initial matter, regarding the question of duty, the court finds that the FAC adequately alleges the existence of a duty of care. As set forth above, one who gratuitously or for consideration undertakes to render services that she "should recognize as necessary for the protection of a third person" has a duty to exercise due care in the rendering of those services if a failure to do so increases the risk of harm to that third person. *Grogan*, 535 S.W.3d at 874 (quoting Restatement (Second) of Torts § 324A); *see also id.* at 873 (characterizing as "well-worn" the principle that a person "who assumes to act . . . may thereby become subject to the duty of acting carefully" (citation omitted)).

The crux of the Brooke's defendants' motion is that the FAC does not allege sufficient facts to show that Harlan-Evitts personally breached any duty of care.[4] They point to the "group pleading" allegations in the FAC specifically as insufficient. Although "group pleading" is certainly frowned upon, particularly in the fraud and securities litigation contexts, it is not always and inevitably improper. Setting aside the question of whether the group allegations plausibly allege knowledge and conduct by *all* of the "Bail Bonding Defendants," the question posed by the Brooke's defendants' motion is whether these allegations plausibly allege facts establishing Harlan-Evitts' individual negligence.

The FAC does not specifically allege that Harlan-Evitts was personally involved in Brooke's Bonding's decision to cover half of Rivers' bail. Instead, it asserts that "Brooke's Bonding agreed to cover $75,000 of the $150,000 bail for the price of $6,000" and that an unidentified "agent" of Brooke's Bonding contacted On Time to see if it would cover the other half. (FAC ¶¶ 65–66.) Harlan-Evitts did not sign the bond condition order; defendant McMillian, another Brooke's Bonding employee, did so. (*Id.* ¶ 72.) The FAC alleges that "agents" of Brooke's Bonding posted a $75,000 bond with the Davidson County Warrant and Bond Office and "departed" that office "without custody of Bricen Rivers" and without requesting a copy of the bond conditions order or obtaining additional information about the terms of Rivers' release. (*Id.* ¶¶ 75–76.)

---

[4] The fact that Harlan-Evitts is the sole member of Brooke's Bonding does not make her automatically liable for negligence by the LLC. Under the Tennessee Limited Liability Act, a member of an LLC "does not have any personal obligation and is not otherwise personally liable for the acts, debts, liabilities or obligations of the LLC whether such arise in contract, tort or otherwise." Tenn. Code Ann. § 48-217-101(a)(1). However, a member of an LLC "may become personally liable in contract, tort or otherwise by reason of such person's own acts or conduct." Tenn. Code Ann. § 48-217-101(a)(3). *Accord Altruist, LLC v. Medex Patient Transp., LLC*, 308 F. Supp. 3d 943, 952 (M.D. Tenn. 2018) (Crenshaw, C.J.).

On June 24, 2024, defendant Ridley, another Brooke's Bonding employee, received the call from Rivers when he had been released from jail; Ridley was responsible for picking him up from the Davidson County Sheriff's Office, returning him to Brooke's Bonding's office, and fitting him with a GPS monitor. (*Id.* ¶¶ 77–81.) The FAC then alleges very generally that the "Bail Bonding Defendants released Bricen Rivers from Brooke's Bonding's office and facilitated his travel to Mississippi," using the money his mother sent to buy him a bus ticket, and therefore knew that he had left Davidson County. (*Id.* ¶¶ 82–84.) Although the FAC alleges that the Bail Bonding Defendants collectively knew at this point that Rivers was "in violation of the conditions of his bond," that allegation conflicts with the more specific factual allegations that none of the Bail Bonding Defendants at that point actually knew what the conditions of release were. In any event, the facts as alleged in the FAC are sufficient to give rise to the reasonable inference that only Wilhoite and Ridley were involved in facilitating the purchase of a bus ticket for Rivers and sending him on his way to Mississippi. Harlan-Evitts, again, is not alleged to have been personally involved up to this point. While it may be reasonable to infer that, as the sole member and manager of Brooke's Bonding, she was aware of what was going on, it is equally reasonable to infer that she was on vacation that week and had no idea what was going on back at the office or that she was a hands-off owner who left the day-to-day operations of the business to her employees.

However, the FAC also alleges that Harlan-Evitts personally received notice of the conditions stated in the bond conditions order on June 28, 2024 and forwarded that email to other agents and employees of Freedom and On Time. (*Id.* ¶¶ 87–88.) And it alleges that, by this time, Harlan-Evitts personally knew that Rivers had left the state and was in violation of the bond conditions order and that she personally instructed Brooke's Bonding employees to facilitate Rivers' return to Davidson County so that Wilhoite could affix a new GPS monitor to his ankle.

(*Id.* ¶ 89.) She did not instruct her employees to travel immediately to Mississippi to arrest Rivers, but it is unclear how that alleged failure made any difference, because Rivers returned to Davidson County on his own the next day, June 29, 2024. (*Id.*)[5]

The FAC alleges that the "Bail Bonding Defendants" collectively knew that Rivers had returned to Brooke's Bonding's office on June 29, 2024. The court construes this allegation to mean, at least, that Harlan-Evitts knew that Rivers was scheduled to return to Brooke's Bonding's office that day, even though she is not alleged to have met with him. Instead, only Wilhoite met with him. Ridley intended to be there but had a scheduling conflict. (*Id.* ¶¶ 90–92.) Brooke's Bonding allegedly failed to have a policy in place to address this situation, and Harlan-Evitts failed to instruct her employees to "immediately forfeit [Rivers] to State custody," despite actual knowledge that he had violated his conditions of release. (*Id.* ¶¶ 89, 93, 97.) And she is alleged to have personally "authorized the release of Bricen Rivers" on June 29, 2024, instead of instructing her employees to arrest and surrender him to the Davidson County Sheriff's Office. (*Id.* ¶¶ 98–100.)

In addition, all Bail Bonding Defendants—which the court construes as reasonably including at least Harlan-Evitts, Ridley, and Wilhoite—knew Rivers' location because of the GPS monitor and therefore knew that he was leaving Davidson County but failed to contact authorities in Tennessee or Mississippi to apprehend him. (*Id.* ¶¶ 102–04, 106.) Three days later, Rivers killed Johansen.

---

[5] It was later discovered, according to an order entered by the Davidson County Criminal Court sitting *en banc*, that Rivers had traveled to Nashville in Johansen's car, thus strongly indicating that Rivers had already contacted Johansen during his first trip to Mississippi, also in violation of the bond conditions order. *See* Order at 6, *In Re: Brooke's Bail Bonding*, No. 2024-A-605 (Davidson Cnty. Crim. Ct. Oct. 7, 2024) (in the record at Doc. No. 56-1).

The court finds that these allegations, which are accepted as true for purposes of the defendants' Motion to Dismiss, are sufficiently specific to give rise to a jury question as to whether Harlan-Evitts breached a duty of reasonable care, simply by being involved in the company's undertaking to monitor Rivers' compliance with his bond conditions and failing to perform that undertaking with due care. Whether such a failure of due care increased the risk to Johansen is also a jury question.[6] Further, the FAC plausibly alleges facts from which a reasonable jury could conclude, in light of the specific conditions barring Rivers from leaving Davidson County and from contacting Johansen, that Harlan-Evitts knew or should have known that properly monitoring Rivers' compliance with the bond conditions order was necessary for Johansen's protection and that the failure to exercise that undertaking with due care would increase the risk of harm that Rivers posed to Johansen. The plaintiff also plausibly alleges a failure to exercise due care, resulting, ultimately, in Johansen's death.

The Brooke's defendants' argument boils down to this: that the wrongful death claim against Harlan-Evitts should be dismissed because the FAC does not contain factual allegations tying Harlan-Evitts' actions (or inactions) to Johansen's death. (*See* Doc. No. 56 at 11.) But the FAC does include allegations supporting a conclusion that Harlan-Evitt undertook to render services to the state when she undertook to monitor Rivers' compliance with the bond conditions order, that she understood that those services were necessary for the protection of Johansen, that she failed to exercise reasonable care in this undertaking, and that this failure increased the risk of harm to Johansen. The motion to dismiss Count I against Harlan-Evitts will be denied.

---

[6] Whether Harlan-Evitts and the other defendants may have viable defenses to liability is not before the court at this time.

## IV. COUNT II: THE § 1983 CLAIMS AGAINST THE BROOKE'S DEFENDANTS

### A. The Parties' Arguments

Section 1983 provides a federal cause of action to any person whose rights "secured by the Constitution" are violated by an official acting "under color of [State law]." 42 U.S.C. § 1983. Thus, to plausibly state a claim under § 1983, a plaintiff must allege the violation of a constitutional right by a person acting under color of state law. *See Phillips v. Tangilag*, 14 F.4th 524, 532 (6th Cir. 2021). The Brooke's defendants argue that the FAC fails on both fronts. They assert that the FAC does not identify a federally protected right of Johansen's that was violated or show that the Brooke's defendants were persons acting under color of state law.

The majority of the plaintiff's response to this argument is devoted to the question of whether the defendants functioned as state actors under the specific facts of this case, as discussed below. He also asserts in a wholly perfunctory fashion that he has adequately alleged the deprivation of a constitutional right: "Lauren Johansen's right not to be deprived of life, liberty, or property without due process of law under the Fourteenth Amendment." (Doc. No. 62 at 20; *see id.* ("Indeed, the Sixth Circuit has said that 'it goes without saying that an individual's interest in preserving her life is one of constitutional dimension.'" (some internal quotation marks omitted) (quoting *Kallstron v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998))).)

In their Reply, the Brooke's defendants contend that the plaintiff "cannot transform [their] alleged failures to protect Ms. Johansen into a Section 1983 claim." (Doc. No. 64 at 5.) They argue that, while the plaintiff now frames the constitutional right at issue as arising under the Fourteenth Amendment, the FAC does not state a claim for violation of the Due Process Clause because, even assuming the Brooke's defendants qualify as state actors, the Due Process Clause does not impose an affirmative duty on the state to protect individuals from private violence. (*Id.* at 6.) The defendants acknowledge an exception to this rule: the state-created-danger theory, which permits

liability "when the state affirmatively acts in a way that either creates or increases a 'risk that an individual will be exposed to private acts of violence.'" *Lipman v. Budish*, 974 F.3d 726, 742, 744 (6th Cir. 2020) (quoting *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017)). And they argue that this exception does not apply in this case, because the plaintiff alleges only failures to act, not an affirmative act by the Brooke's defendants. (Doc. No. 64 at 6.) The plaintiff, with permission, filed a Sur-Reply to address this argument. Because the FAC does not allege facts showing that the Brooke's defendants were state actors, the court does not reach the issue of whether the state-created danger doctrine applies.

### B.      Whether the Defendants Were State Actors

Brooke's Bonding and Harlan-Evitts are not government entities or employees, but the law is clear that private actors may be subject to suit under § 1983 "if their conduct qualifies them to be considered state actors." *Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 139–40 (6th Cir. 2023) (citing *Carl v. Muskegon Cnty.*, 763 F.3d 592, 595 (6th Cir. 2014)). The Sixth Circuit recognizes at least three tests for determining whether a private actor may be treated as a state actor: "'the public-function test, the state-compulsion test, and the nexus test.'" *Id.* at 140 (quoting *Carl*, 763 F.3d at 595). The plaintiff argues that the Brooke's defendants qualify under two of these: the public-function test and the nexus test. (Doc. No. 62 at 15.)

#### 1.      The Public-Function Test

The public-function test is difficult to satisfy. The Supreme Court has emphasized that, under this test, a private entity may qualify as a state actor "when it exercises 'powers traditionally exclusively reserved to the State.'" *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). "[T]o qualify as a traditional, exclusive public function . . . , the government must have traditionally *and* exclusively

performed the function." *Id.* (emphasis in original) (citations omitted). "[V]ery few functions fall into that category." *Id.* (quotation marks and citations omitted).

Generally, to "determine whether the public function test is satisfied, 'the court conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing.'" *Nugent*, 72 F.4th at 140 (quoting *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003)). A plaintiff cannot meet that burden by "simply alleging in a complaint that the [defendant] is a state actor" or that the function it performs is "traditionally exclusively in the province of the State." *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). Rather, to meet that burden, a plaintiff must "advance historical and factual allegations in [his] complaint giving rise to a reasonable inference that [the defendant's area of functioning] is traditionally exclusively in the province of the State." *Id.* (citing *Wittstock*, 330 F.3d at 902). In *Marie*, although the plaintiffs "alleged facts that show that the Red Cross was chartered by the federal government and that it works with state governments that also engage in disaster relief activities," these allegations were "very different from alleging facts tending to show that disaster relief operations are traditionally within the exclusive province of the State." *Id.* In the absence of any such allegations, the court found that the plaintiff failed to satisfy her showing on this test. *Id.*[7]

---

[7] The Sixth Circuit subsequently clarified that it "do[es] not read *Marie* to require a plaintiff to allege the historical basis for every *new* state action claim—only for new functions." *Nugent*, 72 F.4th at 141 n.1. Where it is well established as a matter of precedent that the function in question is a traditional public function—such as incarceration—the plaintiff does not need to allege a historical basis for reaching that conclusion. Here, however, where neither the Sixth Circuit nor the Supreme Court has recognized pretrial supervision as a traditionally exclusive public function, *Marie*'s requirement applies.

In this case, the function identified by the plaintiff is the "pretrial supervision of individuals charged with dangerous crimes"; the plaintiff asserts that this is a traditional state function. (Doc. No. 62 at 15.) While the FAC alleges facts about the role of bail bonding companies in Tennessee under Tennessee law, it does not allege facts suggesting that this function is traditionally *and* exclusively the province of the State. (*See* FAC ¶¶ 19–36.) Notably, with respect to the bail-bonding aspect of bail bonding companies' activities, many courts have observed that "the system of bail bonding has been 'administered by private citizens and businessmen . . . since the inception of the American legal system[.]'" *Hubbard v. Abbott Bailbonds Agency LLC*, No. 1:20-cv-294, 2021 WL 1589109, at *2 (W.D. Mich. Apr. 23, 2021) (quoting *Green v. Abony Bail Bond*, 316 F. Supp. 2d 1254, 1260 (M.D. Fla. 2004)). Bail bondsmen's ability to effect arrests does not make them state actors either, because "[s]tates have long permitted private citizens to make arrests." *Id.* (citing *Weaver v. James Bonding Co.*, 442 F. Supp. 2d 1219, 1224 (S.D. Ala. 2006) (collecting cases)).

The plaintiff, in arguing that he has satisfied this test, recognizes that no caselaw within the Sixth Circuit has expressly addressed whether pretrial supervision is a traditional state function, but he points to district court opinions from other jurisdictions that have concluded that it is. (*Id.* at 15–16 (citing *Meade v. Bonin*, No. CV 20-1455, 2020 WL 5311351, at *3 (E.D. La. Sept. 4, 2020); *Ayo v. Dunn*, No. 17-526-SDD-EWD, 2018 WL 4355199, at *2 (M.D. La. Sept. 12, 2018)).) He also points to Rule 9(A) of the Local Rules of Practice for Bail Bonds for the Criminal Court for Davidson County, which provides that bonding companies act as an "agent of the Court" and that their conduct "constitutes an integral part of the operation of the Court." (*Id.* (quoting Doc. No. 62-1 at 8).) The fact that one state court's local rule provides that the court and bail bonding

companies share the task of monitoring pretrial releasees does not establish that it is an essential state function.

In *Meade*, the Eastern District of Louisiana held, without analysis, that "pretrial detention and supervision are traditionally state functions." *Meade*, 2020 WL 5311351, at *3 (quoting *Ayo*, 2018 WL 4355199, at *2). Neither *Meade* nor *Ayo* considered whether they are also *exclusively* state functions. In *Jackson v. Pantazes*, on which *Meade* also relies, the Fourth Circuit held that a bondsman was a "state actor" who could be sued by a homeowner under § 1983 for injuries sustained from the bondsman's attempt to apprehend her son. 810 F.2d 426, 427 (4th Cir. 1987). While the court found with little discussion that the bondsman acted under a privilege created by the state—because Maryland law authorized him to arrest a fugitive without due process and to break and enter on private property to effect that arrest—it also found that other tests were met, because the bail bondsman enlisted the assistance of a local police officer in forcing entry into a home, and the officer lent his authority to gain entrance to the house, helped drag the mother of the fugitive from the doorway, stood by while the bondsman used force against the mother, and informed the mother that the bondsman could "do whatever he wants." *Id.* at 428. In other words, *Jackson* did not address—and had no need to address—whether monitoring pretrial releasees on bond is a function traditionally and exclusively reserved to the state.

The court is aware of no judicial opinions addressing this issue. The court observes, however, that the federal courts, at least, have long engaged in the practice of releasing pretrial detainees to family members' custody, with the family members charged with supervision and reporting violations of the conditions of release to the court, often but not always in concert with pretrial services. *See, e.g.*, *United States v. Standing Crow*, No. 1:15-CR-10003-CBK, 2015 WL 4692962, at *1 (D.S.D. Aug. 6, 2015) (denying motion to dismiss an indictment against a

defendant charged with criminal contempt for violation of court order appointing the defendant as the third-party custodian of a defendant in a separate case, in which she was specifically directed to "[s]upervise Defendant in accordance with all conditions of release"; "[u]se every effort to assure the appearance of Defendant at all scheduled court proceedings"; and [i]mmediately notify Defendant's Services Officer or the U.S. Probation Office whenever Defendant violates any condition of release or disappears"); *United States v. Harcevic*, No. 4:15 CR 49 CDP-5, 2015 WL 1821509, at *2 (E.D. Mo. Apr. 21, 2015) (releasing a defendant charged with serious crimes to the "third-party custody of his wife, who agrees to supervise him, and to report any violation of the conditions of release," with "location monitoring as directed by the Pretrial Services Office"); *United States v. Culver*, No. 5:07-CR-9-SLB-JEO, 2007 WL 9697655, at *6 (N.D. Ala. Feb. 14, 2007) (ordering that a defendant charged with serious crimes "be released into the third-party custody of his parents, who shall assume the obligations to supervise the defendant, return him to court as needed, and report to the court any violations of the conditions of release by the defendant"). These cases and similar practices in this district strongly suggest that the function has not been traditionally and exclusively reserved to the government.

The court finds, in short, that the FAC does not adequately allege that the pretrial monitoring of conditions of release is a function "traditionally *and* exclusively performed" by the government. *Halleck*, 587 U.S. at 809. For that reason, the plaintiff cannot meet the public-function test.

      2.     *Nexus Test*

The plaintiff asserts that "Brooke's [Bonding] has a close nexus with the state because it is performing a function that is essential to Davidson County's criminal justice system." (Doc. No. 62 at 18.)

The nexus test, also referred to as the "symbiotic relationship test," is satisfied when "there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Marie*, 771 F.3d at 363 (quoting *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007)). Importantly, "this test evaluates whether 'there is a sufficiently close nexus between the state and *the challenged action*.'" *Id.* (emphasis added by *Marie*) (quoting *Wilcher*, 498 F.3d at 520).

"The cases establish no clear standard for identifying a 'sufficiently close nexus.'" *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (quoting *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982) (observing that the state-action determination is a "necessarily fact-bound inquiry"). However, the Supreme Court and the Sixth Circuit have provided some guidelines. Certain factors have been deemed insufficient, in and of themselves (and even in combination), to establish the required nexus between the private actor's complained-of conduct and the state. For instance, extensive state regulation of a private entity's operations does not establish state action via the nexus test. *See, e.g.*, *Rendell–Baker v. Kohn*, 457 U.S. 830, 841–43 (1982); *Metro. Edison Co.*, 419 U.S. at 358 (the plaintiff's showing that the defendant was a "heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and . . . terminate[d] service to petitioner in a manner which the Pennsylvania Public Utility Commission found permissible under state law" was not sufficient to establish that it was a state actor); *Adams v. Vandemark*, 855 F.2d 312, 316 (6th Cir. 1988); *Crowder v. Conlan*, 740 F.2d 447, 4451 (6th Cir. 1984). Public funding of nearly all of the private actor's activities, as well as the private actor's use of public property, are similarly insufficient to establish the required nexus. *See, e.g.*, *Wolotsky*, 960 F.2d at 1336; *Crowder*, 740 F.2d at 450, 453. The minority presence of

public officials on the private actor's decision-making board also does not satisfy the nexus test for state action. *See, e.g.*, *Lansing*, 202 F.3d at 831; *Crowder*, 740 F.2d at 447. Nor does the utilization of public services by private actors. *See Wolotsky*, 960 F.2d at 1337 (6th Cir. 1992) (holding that a private corporation that provided social services to the citizens in Ohio, deriving 75 percent of its funding from the county, was not a state actor under § 1983). Finally, the fact that a private company performs a public contract does not render it a state actor. *Id.* at 1336 ("Acts of private contractors do not become the acts of the government by reason of their significant or even total engagement in performing public contracts." (citing *Rendell–Baker*, 457 U.S. at 840–41)).

In light of this precedent, courts have generally held that bail bondsmen may qualify as state actors under the nexus test only when they make arrests "with the assistance of law enforcement officers or acting in concert with police action." *Popichak v. Peurifoy*, No. 23-CV-3678, 2023 WL 6810096, at *6 (E.D. Pa. Oct. 16, 2023) (quoting *Steward v. A.A. Bails Bondsman Agency*, No. 14-1214, 2014 WL 4824481, at *3 (D.N.J. Sept. 25, 2014)); *Jacobs v. A Robert Depersia Agency*, No. 09-0180, 2009 WL 799944, at *2 (D.N.J. Mar. 20, 2009) (noting that caselaw "dealing with bail bondsmen's status as state actors is scarce" and generally "limited to the cases where bondsmen, acting jointly with police, exercised excessive force during arrests or caused property damage and personal injury upon forcible entry of dwellings," in which "the activities of bondsmen were deemed so closely intertwined with those of police officers whom these bondsmen joined, that State action was deemed present" (citing Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L. Rev. 731, 778 (1996)). On the other hand, when bail bondsmen operate alone, without the participation of state actors, courts have uniformly held that they are not state actors subject to suit under § 1983. *Accord, e.g.*, *Hutchins v. Billy Clark Bail Bonds, Inc.*, No.

3:22cv893/TKW/ZCB, 2022 WL 17812456, at *3 (N.D. Fla. Nov. 8, 2022) ("Numerous courts have held that bail bondsmen are not state actors for purposes of § 1983, unless they were acting at the behest of or in conjunction with law enforcement officers when engaging in the challenged conduct." (collecting cases)), R. & R. adopted, No. 3:22-cv-893-TKW/ZCB, 2022 WL 17811967 (N.D. Fla. Dec. 19, 2022); *Zafar v. Qaddura*, No. 3:18-cv-2829-B-BN, 2018 WL 6624522, at *2 (N.D. Tex. Nov. 27, 2018) ("[B]ail bondsmen are generally not considered state actors for purposes of liability under 42 U.S.C. § 1983. An exception to this rule can exist where the bondsman enlists the assistance of law enforcement officers in arresting the principal or otherwise acts in conspiracy with state actors." (citations omitted) (collecting cases)), R. & R. adopted, No. 3:18-CV-2829-B, 2018 WL 6622195 (N.D. Tex. Dec. 18, 2018); *McDaniel v. Bailey*, 3:18-cv-204-RJC-DLH, 2018 WL 3381428, *4 (W.D.N.C. July 11, 2018) (holding that plaintiff could not maintain a § 1983 claim against a bail bondsman where plaintiff failed to allege that bail bondsman "worked in concert with a state actor or w[as] otherwise acting under the color of state law").

The plaintiff here insists that "[b]ail bonding companies operated by state-licensed bondsmen in Davidson County function as *de facto* pretrial services for the Davidson County criminal courts so that Tennessee can make good on its Constitutional guarantee of the right to bail while maintaining public safety through bond conditions, which are authorized by statute." (Doc. No. 62 at 17.) State courts can revoke a bond company's licensure. (FAC ¶ 30.) And, according to the plaintiff, "the private bail bonding service who posts a criminal defendant's bond and a member of Davidson County Sheriff's Department and/or criminal court staff bonding service share the responsibilities of ensuring the public, including any victim of the defendant's crime, is protected from the violent criminal defendant who is released on bail." (*Id.* ¶ 35.)

The "challenged actions" in this case, however, do not involve any concerted activity by the Brooke's defendants and the Davidson County Sheriff's Office or court staff. Instead, they all concern the defendants' alleged failures to comply with the bond conditions order—specifically, their failure to verify the contents of the bail conditions order before accepting charge of Rivers on June 24, 2024; their failure to detain Rivers once he returned to Davidson County to have his GPS monitor replaced, based on his violation of the conditions of release; and their failure to alert authorities once they knew he had left the state again. (FAC ¶¶ 138–39.) These actions cannot fairly be deemed the actions of the state. No state official was involved or notified of these acts; no state official ratified or approved them. The mere fact that bail bonding is a highly regulated activity, requiring licensure and oversight by the state, is simply not sufficient to establish that the state and bonding companies are in a symbiotic relationship. Where the state did not participate in any way in the Brooke's defendants' challenged decisions, the Brooke's defendants cannot be deemed state actors. *Accord Blackwell v. Allen*, No. 22-1300, 2022 WL 17832191, at *5 (6th Cir. Dec. 21, 2022) (to satisfy the nexus test, the plaintiff "must allege a sufficiently close nexus 'between the state and the *challenged action*'" (emphasis in *Blackwell*) (quoting *Wilcher*, 498 F.3d at 520)).

In sum, the plaintiff's allegations do not satisfy the nexus test, and the court finds that the Brooke's defendants were not state actors for purposes of the plaintiff's § 1983 claim. Having made this determination, the court does not address whether the plaintiff adequately alleges the violation of a constitutional right.

## V.  JOINT VENTURE LIABILITY

Count III of the FAC asserts that Brooke's Bonding and On Time were engaged in a joint venture, pursuant to which they had an equal right to control Rivers once he was bonded out of jail, and that Johansen was killed "as a result of Brooke's Bonding's and On Time Bonding's

negligent, reckless, and/or intentional acts pursuant to their joint venture," thus making them jointly and severally liable for the entirety of a judgment against either of them. (FAC ¶ 161.) Count IV similarly asserts the existence of a joint venture between Brooke's Bonding and Freedom, as a result of which both should be jointly and severally liable for a judgment against either of them. (*Id.* ¶ 167.)

Brooke's Bonding asserts that these claims should be dismissed because (1) joint venture is not a "standalone cause of action"; (2) even if it were, the FAC fails to allege facts that, accepted as true, would establish the existence of a joint venture; and (3) the plaintiff cannot "use the legal theor[y] of joint venture . . . to sidestep Tennessee's abolishment of joint and several liability." (Doc. No. 56 at 17, 19.) The plaintiff opposes dismissal.

As for the defendants' first argument, the court agrees that joint venture is not a cause of action but a theory of liability. *Accord Atchison v. Hubbell Indus. Controls, Inc.*, 777 F. Supp. 3d 834, 846 (M.D. Tenn. 2025). As discussed below, however, it is a viable theory under Tennessee law that will justify imposition of joint and several liability against joint venturers, if the plaintiff establishes the existence of a joint venture. Because the only basis for the plaintiff's joint-and-several-liability claims is the existence of a joint venture, the defendants' third argument does not warrant discussion. Either the FAC adequately alleges the existence of a joint venture, which would support joint and several liability, or it does not. The court addresses that substantive issue below.

### A. Tennessee Law Regarding Joint Venture

Tennessee law has long recognized that "the negligence of those engaged in a joint enterprise or joint venture may be imputed to the other members." *Fain v. O'Connell*, 909 S.W.2d 790, 792 (Tenn. 1995) (citing *Cole v. Woods*, 548 S.W.2d 640 (Tenn. 1977)); *see also Bowman v. Benouttas*, 519 S.W.3d 586, 599 (Tenn. Ct. App. 2016) ("Because each member of a joint venture

is considered the agent of the others, the negligence of one member can be imputed to the rest." (citing *Fain*, 909 S.W.2d at 792)). A joint venture is "something like a partnership, for a more limited period of time, and a more limited purpose." *Fain*, 909 S.W.2d at 792 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 72, at 516–17 (5th ed. 1984)). It is defined as

> an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term . . . .

*Id.* (citation omitted); *see also Via v. Oehlert*, 347 S.W.3d 224, 230 (Tenn. Ct. App. 2010). Thus, the elements necessary to establish a joint venture are: "(1) a common purpose; (2) some manner of agreement among the parties; and (3) an equal right on the part of each party to control both the venture as a whole and any relevant instrumentality." *Bowman*, 519 S.W.3d at 599 (Tenn. Ct. App. 2016) (citing *Fain*, 909 S.W.2d at 793).

## B. The Alleged Joint Venture Between Brooke's Bonding and On Time

Brooke's Bonding asserts that, aside from a conclusory and factually unsupported assertion that Brooke's Bonding and On Time "had an equal right to control Bricen Rivers," the FAC does not include any allegations to support the existence of a common purpose and equal control. (Doc. No. 46 at 18.) The plaintiff responds that the allegations are sufficient: the FAC alleges that Brooke's Bonding and On Time each agreed to cover $75,000 of Rivers' $150,000 bond; both signed the criminal court's bond conditions order that required both entities to surrender Rivers back into custody if he violated those conditions; and, as bonding companies, both defendants had equal capacity to arrest Rivers without a warrant and surrender him back into state custody. (Doc. No. 62 at 24–25 (citing FAC ¶¶ 65–66, 158, 68–73, 159, 36, 160).) "In other words," he asserts, "Brooke's Bail and On Time agreed to join their money together for the common purpose of paying

Rivers's bond, had identical obligations to the Court to enforce the conditions of Rivers's bond, and at all times had equal rights under Tennessee statute to arrest Rivers and return him to custody." (*Id.*)

Under the law set out above, these allegations are sufficient to establish the existence of a joint venture. Here, On Time and Brooke's Bonding allegedly embarked upon a "common purpose," *Bowman*, 519 S.W.3d at 599: to bond out Rivers and to supervise him in accordance with the terms of the bond conditions order. Although the terms of the agreement between them is not yet clear, the FAC clearly alleges the existence of "some manner of agreement" between On Time and Brooke's Bonding to carry out that common purpose. *Id.* And by posting part of the bond, signing the bond conditions order, and agreeing to monitor Rivers, both On Time and Brooke's Bonding had "an equal right . . . to control both the venture as a whole and any relevant instrumentality." *Id.*

In sum, the court finds that the FAC adequately pleads facts that establish the existence of a joint venture. The Brooke's defendants' motion to dismiss the claim of joint and several liability between Brooke's Bonding and On Time, as set forth in Count III, will be denied.

## C. The Alleged Joint Venture Between Brooke's Bonding and Freedom

The Brooke's defendants also assert that the FAC fails to show the existence of a joint venture between Brooke's Bonding and Freedom. They argue that the plaintiff fails to "allege any facts in support of a common purpose and equal control. . . . Plaintiff has admitted that each company has distinct and different purposes . . . . And each completely controls the conduct of its purpose, with no shared control or input from the other." (Doc. No. 56 at 18.) Specifically, Brooke's Bonding is a bail bonding service, and Freedom "provides ankle monitors and GPS monitoring services to Brooke's Bonding as part of Brooke's Bonding's bail bonding activities."

(FAC ¶ 37.) The plaintiff maintains that the FAC adequately alleges the existence of a joint venture between them.

The court agrees that the FAC adequately alleges a joint venture in the undertaking to monitor Rivers. Defendant Wilhoite is alleged to be both the owner of Freedom and an employee and agent of Brooke's Bonding. (FAC ¶ 5.) Upon transporting Rivers to Brooke's Bonding's offices on June 24, 2024, defendant Ridley contacted Wilhoite, who told Ridley to use one of Freedom's GPS ankle monitors that was already in Brooke's Bonding's office. Ridley installed the device. (*Id.* ¶¶ 79–80.) These allegations, accepted as true, give rise to a plausible inference that Brooke's Bonding and Freedom had a common purpose of monitoring Rivers' location, agreed as to the manner of conducting that monitoring, and had an equal right to control of both that venture and the relevant instrumentality—the GPS monitor. The motion to dismiss the claim of joint and several liability between Brooke's Bonding and Freedom, as set forth in Count IV, will be denied.

## VI.     PARTNERSHIP LIABILITY

The Brooke's defendants and the insurance defendants, Continental and American, all seek dismissal of the claims premised on partnership liability. The Brooke's defendants and Continental both challenge Count V, which asserts that, because of the "partnership" between them, Continental will be jointly and severally liable for any judgment awarded against Brooke's Bonding. (*See* FAC ¶ 172.) American challenges Count VI, which asserts the existence of a partnership between American and On Time, as a result of which American will be jointly and severally liable for any judgment awarded against On Time. (*See id.* ¶ 177.) Continental and American also seek dismissal of the substantive claims against them in Counts I and II, which are based on the plaintiff's assertions of the existence of partnerships between them and the bonding companies, giving rise to joint and several liability.

Like the Brooke's defendants' arguments challenging the joint venture claims, all three of the challenges to partnership liability assert that (1) "partnership" is not a standalone cause of action but a legal theory that describes a relationship between parties; (2) even if it were, the FAC does not allege facts that, if true, would be sufficient to establish the existence of a partnership as a matter of law; and (3) the plaintiffs cannot "use a legal theory of partnership to sidestep Tennessee's near abolishment of joint and several liability for tort claims." (*See, e.g.*, Doc. No. 57 at 8.) Again, the only issue to be resolved here is whether the FAC alleges facts sufficient to plead the existence of partnerships.

### A. Tennessee Law Regarding the Formation of a Partnership

It has long been the rule under Tennessee law that "all partners are liable jointly and severally for all obligations of the partnership unless otherwise . . . provided by law." *Eagles Landing Dev., LLC v. Eagles Landing Apartments, LP*, 386 S.W.3d 246, 253 (Tenn. Ct. App. 2012) (quoting Tenn. Code Ann. § 61-1-306); *see also E. Tenn. Nat. Gas Co. v. Peltz*, 270 S.W.2d 591, 607 (Tenn. 1954) ("The rule is well settled that . . . partners are jointly and severally liable for matters growing out of wrongful acts of the partnership." (citing Tenn. Uniform Partnership Law, Tenn. Code §§ 7852, 7853, 7854)).

A partnership is defined as "an association of two (2) or more persons to carry on as co-owners of a business or other undertaking for profit." Tenn. Code Ann. §§ 61-1-101(9) (2024),[8] 61-1-202(a); *see also Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991). While a partnership can only be formed pursuant to an agreement, such an agreement may be express or implied. *Swecker v. Swecker*, 360 S.W.3d 422, 426 (Tenn. Ct. App. 2011). "[I]t is not essential that the parties actually

---

[8] This provision was amended effective July 1, 2024, after the events giving rise to this lawsuit, but the amendments are not relevant here except insofar as they renumbered some of the subsections that are relevant.

intend to become partners." *Id.* (quoting *Bass*, 814 S.W.2d at 41). What matters instead is their "intent to do the things [that] constitute a partnership." *Id.* "Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money." *Id.* (quoting *Bass*, 814 S.W.2d at 41). "Generally, what will constitute a partnership is a matter of law, but whether a partnership exists under conflicting evidence is one of fact." *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001) (quoting *Wyatt v. Brown*, 281 S.W.2d 64, 67 (Tenn. Ct. App. 1955)).

### B. The Alleged Partnerships with the Insurance Companies

The entirety of the allegations against the insurance companies in the FAC are as follows:

41. Defendants American Contractors Indemnity Company ("ACIC") and Continental Heritage Insurance Company ("CHIC") (jointly "insurance defendants") are insurance companies who have partnered with bail bonding services in order to share in the profits obtained by those bail bonding services.

. . . .

42. At all times herein described, Brooke's Bonding and CHIC operated as a partnership, whether implied or express, in order to post bonds for criminal defendants, including Bricen Rivers.

43. In carrying out the business of their partnership, Brooke's Bonding and CHIC combined their property, labor, skills, experience, and/or money to make a profit. Brooke's Bonding performed many traditional aspects of its bail bonding services, including, *inter alia*, finding clientele, appearing in court, securing the release of a criminal defendant, ensuring the defendant complied with conditions of bail, and ensuring the defendant appeared for his or her court hearings.

44. CHIC provided financial backing that allowed the partnership to bond out criminal defendants beyond what Brooke's Bonding's individual liquidity would otherwise allow.

45. CHIC executed powers of attorney for Brooke's Bonding's agents and/or employees, including Defendant Harlan-Evitts. These powers of attorney authorized Brooke's Bonding's agents and/or employees to execute bonds on behalf of CHIC.

46. Brooke's Bonding and CHIC shared profits. Whenever a criminal defendant, or an individual on behalf of a criminal defendant, paid a premium for bail bonding services, Brooke's Bonding and CHIC would each receive a portion of that premium.

47. Brooke's Bonding and CHIC also shared losses. If a criminal court required forfeiture of a bond, Brooke's Bonding and CHIC shared the cost of paying the forfeited bond to the criminal Court.

. . . .

48. At all times herein described, On Time Bonding and ACIC operated as a partnership, either implied or express, in order to post bonds for criminal defendants, including Bricen Rivers

49. In carrying out the business of their partnership, On Time Bonding and ACIC combined their property, labor, skills, experience, and/or money to make a profit. On Time Bonding performed many traditional aspects of its bail bonding services, including, inter alia, finding clientele, appearing in court, securing the release of a criminal defendant, ensuring the defendant complied with conditions of bail, and ensuring the defendant appeared for his or her court hearings.

50. ACIC provided financial backing that allowed the partnership to bond out criminal defendants beyond what On Time Bonding's individual liquidity would otherwise allow.

51. On Time Bonding and ACIC shared profits. Whenever a criminal defendant, or an individual on behalf of a criminal defendant, paid a premium for bail bonding services, On Time Bonding and ACIC would each receive a portion of that premium.

52. On Time Bonding and ACIC also shared losses. If a criminal court required forfeiture of a bond, On Time Bonding and ACIC shared the cost of paying that bond to the criminal Court.

(FAC ¶¶ 41–52.)

Brooke's defendants assert these allegations "merely describe[] an arms-length relationship between a bond business and an insurer." (Doc. No. 56 at 18.) Similarly, Continental argues that the conclusory assertion that it and Brooke's Bonding "combined their property, labor, experience, and/or money in order to carry out a bail bonding service for profit (FAC ¶ 169) is not supported by actual facts showing that they actually did so. (Doc. No. 57 at 7.) The defendants assert that, as alleged in the FAC, each company has a "distinct and different purpose": the bail

bonding companies are bail bonding companies, while the insurance companies are insurance companies, and each "controls the conduct of its purpose alone, with no shared control or input from the other." (*Id.* at 7–8; *see also* Doc. No. 60 at 2 ("Plaintiff's allegations regarding the nature of the legal relationship between [America] and On Time Bonding are not supported by the factual allegations contained in the Complaint."; *id.* at 10 ("There are no allegations that [American] and On Time Bonding shared losses, profits, or financial records with one another," "filed joint tax returns or partnership tax returns," or "considered themselves co-owners of the other's business.").)

The court, in short, agrees that there are no actual facts alleged in the FAC that establish any of the terms of the relationship between the insurance companies and the bail bonding companies, and the conclusory assertions that they operated in partnership are simply not sufficient. *Accord Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (quoting *Twombly*, 550 U.S. at 555, 557)). For example, although the plaintiff asserts that the bonding companies and insurance companies share profits, all he alleges as a factual matter is that they share (in some undefined ratio) the premium paid by a person for bond services. But Tennessee courts distinguish between profits and gross returns, and simply sharing a premium is not remotely similar to sharing profits. And, while a "person who receives a share of the profits of a business is presumed to be a partner in the business," Tenn. Code Ann. § 61-1-202(c)(3), "[t]he sharing of gross returns does not by itself establish a partnership," *id.* § 61-1-202(c)(2). *See Messer Griesheim*, 131 S.W.3d at 472 ("We are further compelled to point out the distinction between profits and gross revenues. . . . [U]nlike the sharing of profits, the sharing of gross returns does not itself establish a partnership.").

Similarly, the fact that the insurance companies and the bonding companies could both suffer forfeiture of a posted bond if the bonding company failed to ensure a pretrial releasee's appearance in court does not suggest that they equally shared in each other's net losses. The facts as alleged suggest nothing more than a contractual relationship between the bail bonding defendants and the insurance company defendants.

Accepting as true the "well-pleaded factual allegations in the complaint," *Courtright*, 839 F.3d at 518, but disregarding the "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678, the court finds that the FAC fails to plausibly allege that Continental and Brooke's Bonding were in a partnership or that American and On Time formed a partnership. Continental and American are entitled to dismissal of all claims against them, as they are entirely premised upon the existence of such partnerships.

## VII.  CONCLUSION

For the reasons set forth herein, the Brooke's defendants' Motion to Dismiss (Doc. No. 56) will be granted in part and denied in part, and the insurance companies' Motions to Dismiss (Doc. Nos. 57, 59) will be granted in their entirety. As a result, Count II will be dismissed as to Harlan-Evitts and Brooke's Bonding, and all claims against Continental and American will be dismissed. While no other defendants have filed motions to dismiss, the determination that the FAC fails to allege facts that, if true, establish that Brooke's Bonding and Harlan-Evitts were state actors, for purposes of a claim under 42 U.S.C. § 1983, has obvious implications for the other defendants in this case.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge